John DOE, Appellant,

v.

William H. WEBSTER, Director, FBI, et al.

No. 77-2011.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1978.

Decided July 24, 1979.

Rehearing Denied Oct. 17, 1979.

K. Peter Schmidt, Washington, D. C., with whom Bruce L. Montgomery, Washington, D. C., was on the brief, for appellant.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Alice P. Frohman, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and HAROLD H. GREENE,* United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge HAROLD H. GREENE.

HAROLD H. GREENE, District Judge:

This is an appeal from an order of the District Court dismissing an action to compel the expungement of all records relating to a federal conviction set aside under section 5021 of the Federal Youth Corrections Act.[1] The court rested its holding on the ground that the Act does not authorize the expungement of criminal arrest and conviction records.[2] For the reasons stated below,

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 18 U.S.C. § 5005 et seq. (1976).

2. Although the Act has been in effect for almost thirty years, and has been the subject of considerable academic comment and judicial decision, neither the U. S. Supreme Court nor

we affirm the decision of the District Court with respect to the record of appellant's arrest, and reverse with respect to the record of his conviction.

## I

On January 18, 1971, appellant, then a minor, pleaded guilty to and was convicted of a federal marijuana offense in the United States District Court for the District of Arizona and was sentenced to confinement under the Federal Youth Corrections Act.[3] Several months later, appellant's sentence was suspended and he was placed on probation pursuant to 18 U.S.C. § 5010(a). On June 5, 1973, he was unconditionally discharged from probation, and the conviction was set aside pursuant to 18 U.S.C. § 5021(b). The sentencing court subsequently issued a certificate to that effect.

On March 16, 1977, appellant filed suit in the court below against the Director of the Federal Bureau of Investigation, the Attorney General of the United States, and the Secretary of the Treasury (hereinafter "the government") to enjoin the maintenance and dissemination of his arrest, conviction, and prison records, and of any files growing out of these records, and to require physical destruction of all such documents now in existence. In support of his request for relief, appellant asserted generally that the maintenance of his criminal records has a chilling effect on his employment, travel, bar admission, and career opportunities. More specifically, he claimed that, although a recent graduate of a prestigious law school,[4] he is absolutely barred by his conviction from the practice of law in at least one state, and that the government's con-

tinued maintenance and dissemination of his criminal records have caused him apprehension in seeking federal employment for fear that those records may be reviewed and result in both the denial of the employment and the drawing of additional attention to his past criminal involvement. Appellant also sought a declaratory judgment that the continued maintenance of his criminal records is contrary to the provisions of 18 U.S.C. § 5021(b),[5] and that, because his arrest and conviction have been obliterated by operation of law, he is free to answer in the negative to any and all questions from any persons, including law enforcement agencies and prospective employers, as to whether he has ever been arrested for or convicted of any crime.

The government moved to dismiss for lack of jurisdiction and failure to state a claim upon which relief may be granted to which appellant responded with a motion for summary judgment, based upon his claim that section 5021(b), either alone or in conjunction with the inherent equitable power of the court, supported the grant of the relief sought. On September 6, 1977, the District Court denied appellant's motion and granted that of the government, holding that the statute does not authorize the expungement of criminal records. This appeal followed.

## II

Appellant argues most broadly that he is entitled to the expungement of both his arrest record and his conviction record, and to a declaratory judgment that he may answer in the negative when asked about

---

any of the Circuits has fully examined the effect to be accorded a set-aside conviction. But see note 43 *infra*.

3. The record does not reveal the precise nature of the sentence, but it was presumably imposed under 18 U.S.C. § 5010(b).

4. Subsequent to his release from prison, appellant had received an A.A. degree from a community college where he was on the dean's list with a straight-A average, and an A.B. degree from a large American university, graduating Phi Beta Kappa with high honors in his major.

5. That section provides: "Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall issue to the youth offender a certificate to that effect."

either his arrest or his conviction. He claims that the scope and purpose of the Act's set-aside provisions emphasize the rehabilitative function of providing an ex-offender with a fresh start by completely clearing his record, and that, in any event, this would be an appropriate case for the exercise of the court's inherent equitable jurisdiction.[6] The government, on the other hand, asserts that appellant is entitled to none of the requested relief, arguing that section 5021(b) does not expressly require or authorize expungement or destruction of any criminal records; that no extraordinary circumstances are present which might have permitted the District Court to exercise its equity power in that regard; and that no justiciable controversy exists with respect to appellant's request for a declaratory judgment. We view the positions of both parties as too broad.

 With respect to appellant's arrest record, it is clear, first, that no statute either requires or authorizes its expungement. While some state statutes specifically authorize the expungement of arrest records in various circumstances,[7] the Federal Youth Corrections Act does not. To be sure, appellant suggests that the purposes of the Act would be served by wiping out not only the record of his conviction but his arrest record as well, but neither the plain language of the statute nor its legislative history supports that argument. Although section 5021 explicitly provides for the setting aside of a conviction, see Part III *infra,* it makes no reference at all to an arrest.

Secondly, although there are indeed many instances in which courts have ordered expungement of arrest records in the exercise of their inherent equitable powers,[8] all of these cases involved either a lack of probable cause coupled with special circumstances,[9] flagrant violations of the Constitution,[10] or other unusual and extraordinary circumstances.[11] See generally *Menard v. Saxbe,*

6. Appellant claims that the District Court erred by dismissing the complaint on the statutory ground without considering the facts and circumstances of his case in light of its inherent equitable powers. See note 8, *infra* and accompanying text.

7. *E. g.,* Md.Ann.Code 27, § 737 (Supp.1978); Va.Code Ann. § 19.2–392.2 (Supp.1978); Cal. Pen.Code § 1203.45 (Supp.1978).

8. The power to order expungement is a part of the general power of the federal courts to fashion appropriate remedies to protect important legal rights. *Chastain v. Kelley,* 167 U.S.App. D.C. 11, 13, 510 F.2d 1232, 1234 (1975); *Menard v. Saxbe,* 162 U.S.App.D.C. 284, 290, 498 F.2d 1017, 1023 (1974); *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 56, 478 F.2d 938, 966, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); *Kowall v. United States,* 53 F.R.D. 211, 213–14 (W.D.Mich.1971).

9. *E. g., Gomez v. Wilson,* 323 F.Supp. 87 (D.D. C.1971) (lack of probable cause for vagrancy arrest); *Urban v. Breier,* 401 F.Supp. 706 (E.D. Wis.1975) (dragnet style arrests for murder without probable cause); *Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186 (D.D.C.1975), aff'd in part and rev'd in part, 184 U.S.App.D.C. 215, 566 F.2d 107 (1977) (mass arrests of demonstrators without probable cause).

10. *E. g., Tatum v. Morton,* 183 U.S.App.D.C. 331, 562 F.2d 1279 (1977) (arrest of attendants at peaceful Quaker prayer vigil outside White House in violation of First Amendment); *Sullivan v. Murphy, supra* note 8 (mass arrest of "May Day" protesters of U. S. military involvement in Southeast Asia in violation of Fourth Amendment); *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967) (arrests in violation of Fifteenth Amendment to intimidate black citizens in their attempts to encourage others to vote); *Bilick v. Dudley,* 356 F.Supp. 945 (S.D. N.Y.1973) (arrest made to harass group because of political beliefs); *Hughes v. Rizzo,* 282 F.Supp. 881 (E.D.Pa.1968) (arrests made for purposes of "harassing hippies"); *Wheeler v. Goodman,* 306 F.Supp. 58 (W.D.N.C.1969) (three-judge court) *vacated on other grounds,* 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971) (repeated Fourth Amendment violations in enforcement of vagrancy law).

11. *Tarlton v. Saxbe,* 165 U.S.App.D.C. 293, 507 F.2d 1116 (1974) (accuracy of records in question); *United States v. Benlizar,* Crim.No. 76–760 (D.D.C., October 3, 1978) (entrapment, DEA's destruction of evidence in violation of law, and agent's misleading testimony); *Grandison v. Warden,* 423 F.Supp. 112 (D.Md.1976) (youth improperly tried as an adult); *United States v. Bohr,* 406 F.Supp. 1218 (E.D.Wis. 1976) (arrest record of attorney whose indictment for mail fraud was dismissed, the court finding that no law enforcement purpose would be served by further maintenance of the records); *Kowall v. United States, supra* note 8 (arrest for failure to report for induction based

162 U.S.App.D.C. 284, 498 F.2d 1017, 1023–25, 1030 (1974); *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 478 F.2d 938, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); *Menard v. Mitchell*, 139 U.S.App.D.C. 113, 118–120, 430 F.2d 486, 491–93 (1970); *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967). Cf. *Peters v. Hobby*, 349 U.S. 331, 348–49, 75 S.Ct. 790, 99 L.Ed. 1129 (1954) (expungement of federal personnel records).

While the decision to expunge an arrest record depends on the facts and circumstances of the case,[12] there must be a logical relationship between the injury and the requested remedy.[13] The general rule which emerges from the cases[14] is that expungement of an arrest record is appropriate when serious governmental misbehavior leading to the arrest, or unusually substantial harm to the defendant not in any way

attributable to him, outweighs the government's need for a record of the arrest.[15]

■ Inasmuch as no unusual or exceptional circumstances are alleged here, whether by way of governmental misconduct or otherwise, and as there is apparently no question but that appellant was properly arrested and convicted, his arrest fails to meet that general test. Even individuals who were never convicted are not entitled to the expungement of their arrest records as a matter of course,[16] and absent specific statutory authority it would be wholly inappropriate to order such an expungement in a case such as this where there has been not only a valid arrest but a valid conviction.

For these reasons, we conclude that the government is entitled to retain the record of appellant's arrest in its appropriate files.[17]

on statute subsequently declared unconstitutional); *United States v. Kalish*, 271 F.Supp. 968 (D.P.R.1967) (arrest for refusal to step forward to report for induction into the armed forces based on the advice of counsel); *United States v. Hudson*, Crim.No. 49590–74 (D.C.Super.Ct.1975) aff'd sub nom., *District of Columbia v. Hudson, et al.*, Case No. 9312 (D.C.App. July 19, 1979) (arrest for murder—later determined that cause of death was suicide).

**12.** *United States v. Bohr, supra* note 11, 406 F.Supp. at 1219; *United States v. Seasholtz*, 376 F.Supp. 1288, 1289 (N.D.Okl.1974); *United States v. Rosen*, 343 F.Supp. 804, 809 (S.D.N.Y. 1972); *Kowall v. United States, supra* note 11, 53 F.R.D. at 214; *United States v. Kalish, supra* note 11, 271 F.Supp. at 970; *Doe v. Commander*, 273 Md. 262, 329 A.2d 35, 43–44 (1974); *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157, 162–63 (1972) (en banc); *In re R.L.F.*, 256 N.W.2d 803 (Minn.1977); *Commonwealth v. Malone*, 244 Pa.Super. 62, 366 A.2d 584, 589 (1976). See also *Coleman v. United States Department of Justice*, 429 F.Supp. 411 (N.D.Ind. 1977); *Shadd v. United States*, 389 F.Supp. 721 (W.D.Pa.1975) aff'd, 3 Cir., 535 F.2d 1247, cert. denied 429 U.S. 887, 97 S.Ct. 241, 50 L.Ed.2d 169.

**13.** See *United States v. McLeod, supra* note 10, 385 F.2d at 749–50; *Chastain v. Kelley, supra* note 8, 167 U.S.App.D.C. at 15, 510 F.2d at 1236.

**14.** The decisions are not all consistent, nor does each of them provide a fully-articulated rationale.

**15.** *United States v. Kowall, supra* note 11, 53 F.R.D. at 214; *United States v. Bohr, supra* note 11, 406 F.Supp. at 1219–20; cf. *Chastain v. Kelley, supra* note 8, 167 U.S.App.D.C. at 15, 510 F.2d at 1236. If there was no crime, or if the government concedes that the defendant was not in any way implicated in its commission, it would appear to have no need for the records at all. If, however, the charges are dismissed for some other reason (*e. g.*, a plea bargain) or if the defendant is tried and acquitted on a "technical" ground, there may arguably be a need to retain the record for investigatory purposes in the event that another, similar, offense is committed. See generally Part VII, *infra*.

**16.** *United States v. Linn*, 513 F.2d 925 (10th Cir.) cert. denied, 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975); *Rogers v. Slaughter*, 469 F.2d 1084, 1085 (5th Cir. 1972).

**17.** See *Stevenson v. United States*, 127 U.S. App.D.C. 43, 380 F.2d 590, cert. denied, 389 U.S. 962, 88 S.Ct. 347, 19 L.Ed.2d 375 (1967); *United States v. Linn, supra* note 16; *Rogers v. Slaughter, supra* note 16, 469 F.2d at 1085; *Coleman v. United States Department of Justice, supra* note 12, 429 F.Supp. at 413; *United States v. Seasholtz, supra* note 12, 376 F.Supp. at 1289; *Hammons v. Scott*, 423 F.Supp. 625, 627–28 (N.D.Cal.1976); *Shadd v. United States, supra* note 12, 389 F.Supp. at 722; *United States v. Dooley*, 364 F.Supp. 75, 78–79 (E.D. Pa.1973); *United States v. Rosen, supra* note 12, 343 F.Supp. at 809; *Matter of Alexander*, 259 A.2d 592, 593 (D.C.App.1969).

## III

The issues are quite different with respect to appellant's conviction, for section 5021(b) of the Federal Youth Corrections Act specifically provides that:

Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, *which discharge shall automatically set aside the conviction,* and the court shall issue to the youth offender a certificate to that effect (emphasis added).

The question, then, is: what does "set aside the conviction" mean?

Appellant answers quite simply that to set aside a conviction means to expunge it, and that expungement implies the physical destruction of all pertinent records. The government, on the other hand, contends that a set-aside could not possibly be an expungement as defined by appellant because (1) such a view would sanction a violation of federal record-keeping laws, (2) Congress would not have provided for a set-aside certificate to be issued if the record were intended to be completely obliterated, and (3) Congress did not use the word "expunge" in the statute.

 We do not find persuasive the government's contention that an expungement would improperly require the Attorney General to violate his statutory duty under 28 U.S.C. § 534 to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records . . . [and to] exchange these records

with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions." While Congress and the courts have recognized that keeping criminal records constitutes an important police function, *Menard v. Mitchell, supra; Morrow v. District of Columbia,* 135 U.S.App.D.C. 160, 417 F.2d 728 (1969),[18] it is equally well settled that, based upon either statutory authorization or the courts' inherent equity power "to vindicate substantial rights provided by statute [and] organic law," such records may be ordered expunged from the FBI's criminal files notwithstanding the general record-keeping laws. *Sullivan v. Murphy, supra,* 156 U.S.App.D.C. at 73–74, 478 F.2d at 972–3; *Menard v. Saxbe, supra,* 162 U.S. App.D.C. at 290, 498 F.2d at 1023;[19] see also, *Kowall v. United States,* 53 F.R.D. 211 (W.D.Mich.1971); *Tarlton v. Saxbe,* 165 U.S.App.D.C. 293, 298, 507 F.2d 1116, 1121 (1974); *Utz v. Cullinane,* 172 U.S.App.D.C. 67, 74 n. 10, 520 F.2d 467, 474 n. 10 (1975).

 We similarly reject the government's argument that the existence of a provision in section 5021(b) for the issuance of a certificate attesting to the set-aside of the conviction militates against a construction favoring expungement. The government reasons that the issuance of such a certificate would not be necessary if the offender's record were meant to be completely eradicated. This argument, however, begs the question for, as a practical matter, the issuance of a certificate may be as necessary to an offender whose record has been expunged as it is to one whose record has been perpetuated. Expunge-

18. Many states likewise require the collection and transmission of criminal justice data to state and federal law enforcement agencies, see, *e. g.,* Wisc.Stat.Ann. § 165.84 (1957), and even absent a specific statute, such procedures are usually held to be within the authority of the police. *Herschel v. Dyra,* 365 F.2d 17, 20 (7th Cir.) cert. denied, 385 U.S. 973, 87 S.Ct. 513, 17 L.Ed.2d 436 (1966); Note, *Retention and Dissemination of Arrest Records: Judicial Response,* 38 Chi.L.Rev. 850, 851 (1971) [hereinafter cited as "Judicial Response"]. See also cases cited note 17 *supra.*

19. In *Menard v. Saxbe,* this court determined that the Federal Bureau of Investigation has an affirmative duty not to maintain in its criminal investigation files the records of persons arrested unlawfully. Specifically, we held that when the FBI is "apprised that a person has been exonerated after initial arrest, released without charge and [with] a change of record to 'detention only,' the FBI has the responsibility to expunge the incident from its criminal identification files." 162 U.S.App.D.C. at 295, 498 F.2d at 1028.

ment is an effective remedy, but it cannot erase all which has preceded it. While official records may be purged, other references to the fact of conviction, such as newspaper files or credit records, remain intact. See also note 41 *infra*. Thus, the issue of a prior record may be raised by, for example, an employer who somehow obtained information concerning the event, in which case the certificate would be evidence of the eradication of the conviction. For that reason, if for none other,[20] the provision which contemplates the issuance of such a certificate is as consistent with a construction of the Act favoring expungement as it is with one which assumes the perpetuation of conviction records.

■ Finally, we do not accept the government's view, based upon *United States v. McMains,* 540 F.2d 387 (8th Cir. 1976), that had the Congress meant to authorize an expungement, it would have used that specific term (as it did, for example, in 21 U.S.C. § 844(b)(2)), rather than the phrase "set aside the conviction." The Federal Youth Corrections Act was enacted in 1950, long before the term "expungement" gained general currency.[21] There is no reason to suppose that when Congress in 1950 spoke of setting aside a conviction, it consciously and deliberately intended to distinguish that concept from expungement.[22] The contrary conclusion is far more plausible: that prior to the time the term "expungement" became fashionable, Congress meant precisely that when it directed conviction records be set aside upon the rehabilitation of the youthful offender.[23]

## IV

The government contends that, while the youthful offender whose conviction has been set aside under section 5021(b) may well be entitled to removal of any and all of the so-called "legal" disabilities which attach to a criminal conviction by statute—*e. g.,* loss of the right to vote,[24] to hold public

---

**20.** The set-aside certificate could hardly be regarded as conceptually inconsistent with an expungement; if anything, it reinforces the conclusion that a significant event having wide-ranging consequences has occurred. The certificate has also been regarded as a symbolic token of forgiveness, trust, and confidence, thus aiding in the rehabilitation process. See *United States v. Glasgow,* 389 F.Supp. 217, 224–5 (D.D.C.1975); Note, *Expungement of Criminal Records Under the Youth Corrections Act,* 62 Iowa L.Rev. 547, 565 (1976) [hereinafter cited as *Expungement of Criminal Records*].

**21.** The concept itself is not a new one, see, *e. g., State v. Tyndall,* 224 Ind. 364, 66 N.E.2d 755 (1946), but the term does not appear to have been used anywhere in the United States Code until 1966, and it was not employed in section 844(b)(2) until 1971. Moreover, model expungement acts and other expungement statutes did not become prevalent until well after the hearings on the proposed legislation. See *Expungement of Criminal Records, supra* note 20, at 565; Comment, *Criminal Records of Arrest and Conviction: Expungement from the General Public Access,* 3 Calif.W.L.Rev. 121, 124 (1967). Pursuant to the recommendations of the National Commission on Uniform State Laws in its 1970 model statute, thirty-six states enacted expungement laws with respect to drug offenders. *United States v. Glasgow, supra* note 20, 389 F.Supp. at 225 n. 21.

**22.** As Professor Aidan Gough points out in *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status,* 1966 Wash.U.L.Q. 147, 149 [hereinafter cited as "Gough"], there is no uniform terminology in this area, and similar functional processes for deleting the adjudication of guilt upon proof of reformation are designated in various jurisdictions and even within jurisdictions as "expungement," "record sealing," "record destruction," "obliteration," "setting aside of conviction," "annulment of conviction," "amnesty," "nullification of conviction," "purging," and "pardon extraordinary." Likewise, statutes and court decisions often give wholly different meanings and ascribe wholly different consequences to each of these various labels. See generally, *Doe v. Commander, supra* note 12, 329 A.2d at 38–39. In short, not much can be made of the choice of words alone.

**23.** This conclusion is buttressed by the legislative history of the Act. See pp. ——–—— of 196 U.S.App.D.C., pp. 1236–1240 of 606 F.2d, *infra*.

**24.** Almost all states have enacted some form of statute disenfranchisement of persons convicted of a felony, *e. g.,* Alaska Stat. § 15.05.030 (1962), an infamous crime, *e. g.,* Wash.Rev. Code Ann. § 29.59.060 (1961); any crime, *e. g.,* Mo.Ann.Stat. § 561.026 (Vernon) (Crim. Code Supp.1979); or specified offenses, *e. g.,* Ariz. Rev.St.Ann. § 16–101(5) (1975), which operates

office,[25] or to execute and enforce contracts;[26] loss of certain pension benefits;[27] loss of capacity to testify,[28] to serve as a juror,[29] or as a court-appointed fiduciary;[30] and grounds for divorce[31]—he is entitled to nothing more.[32]

■ That line of reasoning, however, is squarely refuted by the legislative history of the Youth Corrections Act. The authors of that law evidenced relatively little interest in such matters, significant as they may be in individual instances, as an ex-offender's right to public office, his service as a

court-appointed fiduciary, his capacity to testify, and the like. Their primary concern was that rehabilitated youth offenders be spared the far more common and pervasive social stigma and loss of economic opportunity that in this society accompany the "ex-con" label. While the legislative history offers little guidance as to the reasoning behind the drafters' choice of terminology, it is crystal-clear in one respect: they intended to give youthful ex-offenders a fresh start, free from the stain of a criminal conviction, and an opportunity to clean

until such time as the person's civil rights are restored.

25. In most states there are constitutional and statutory provisions disqualifying persons convicted of certain crimes from holding any office of trust or profit, e. g., Ky. Const. § 150 (1970); from holding any public office, e. g., N.M. Stat. Ann. § 5–1–2 (1974), or from keeping an office already held, e. g., Fla.Stat.Ann. § 114.01 (1973), N.J.Stat.Ann. § 2A:135–9 (1969). While the disqualification from holding federal office is not as broad, there are statutes barring an offender from federal public office for a specific period, e. g., 5 U.S.C. § 7313 (1976) or requiring forfeiture of public office for individuals convicted of specific offenses, e. g., 18 U.S.C. § 655 (1976) (bank examiners convicted of theft); 18 U.S.C. § 1913 (1976) (officers found guilty of lobbying with appropriated monies).

26. A few states retain "civil death" statutes which "deem civilly dead" persons sentenced to life imprisonment, or suspend all civil rights and powers of persons sentenced to lesser terms. See, e. g., R.I. Gen.Laws Ann. § 13–6–1 to –2 (1956). Some of these jurisdictions hold that civil death deprives the convict of all contractual rights, e. g., Okl.Stat.Ann. tit. 15, § 11 (Supp.1978–79), although courts have generally ameliorated this disability in order to allow contracts for necessities. See Byers v. Sun Savings Bank, 41 Okl. 728, 139 P. 948 (1914).

27. E. g., 38 U.S.C. § 3505 (1964) (veteran's benefits); 42 U.S.C. § 402(u) (1976) (social security); N.J.Stat.Ann. § 43:1–2 (1962) (all state and municipal plans).

28. A few states render convicted perjurers incompetent as witnesses, e. g., Ala.Code tit. 7, § 434 (1940); Vt.Stat.Ann. tit. 12, 1608 (1959). As a general rule, however, the competency of a witness is a question for the court, the jury having the power to determine how much weight to accord his testimony. About half the states provide that a witness who has been convicted of any crime may have his testimony impeached thereby, e. g., Ark.Stat.Ann. § 28–

605 (1962); and leave to judicial interpretation the question of what kind of "crime." Other states specify that only a witness convicted of an infamous crime, e. g., Tenn.Code Ann. § 40–2712 (1975), a felony or perjury, e. g., W.Va.Code Ann. § 57–3–5 (1966), or "a felony, any larceny or any other crime involving moral turpitude," e. g., Me.Rev.Stat.Ann. tit. 16, § 56 (Supp.1978–79), may be so impeached.

29. About three-fourths of the states expressly exclude certain persons from jury qualifications. E. g., Ky.Stat.Ann. § 29.025 (1971) (disqualifies persons convicted of felonies unless pardoned); Ala. Code tit. 30, § 21 (Supp.1973) (disqualifies persons convicted of crimes involving moral turpitude). Additionally, several statutes provide that a criminal conviction is grounds for challenge for cause. E. g., Tex. Code Crim.Proc. art. 35.16 (Supp.1978).

30. E. g., D.C. Code Ann. § 20–351 (1973) (conviction of infamous crime); Wash.Rev.Code Ann. § 11.36.010 (1961) (conviction of crime of moral turpitude).

31. E. g., Utah Code Ann. § 30–3–1 (1953) (conviction of felony); Minn.Stat.Ann. § 518.06 (Supp.1978) (sentence to imprisonment, whether or not served); Kan.Stat.Ann. § 60–1601 (1967) (conviction of felony and actual imprisonment).

32. Additionally, in the case of aliens, such disabilities may include exclusion, 8 U.S.C. § 1182(a)(9) (1976); denial of naturalization, 8 U.S.C. §§ 1427(a), 1101(f) (1976); or deportation, 8 U.S.C. § 1251(a)(4) (1976). See also Mestre Morera v. United States Immigration and Naturalization Service, 462 F.2d 1030 (1st Cir. 1972). See generally The Collateral Consequences of a Criminal Conviction, 23 Vand.L. Rev. 929, 966–1142 (1970). For a discussion of the various disabilities and effects of an arrest record alone, see United States v. Benlizar, supra note 11, slip op. at 8–12; Hudson v. United States, supra note 11, slip op. at 8–17.

their slates to afford them a second chance, in terms of both jobs and standing in the community. A brief review of that history amply demonstrates this point.

In 1941, Chief Justice Harlan F. Stone appointed a special committee of distinguished federal judges under the auspices of the Judicial Conference of the United States to conduct a study of the crime correction program in the federal courts.[33] The report of that committee contained a draft of what was later to become the Federal Youth Corrections Act,[34] and it was presented to the Judicial Conference in 1942,[35] and the Congress in 1943.[36]

That draft provided, in the predecessor provision to the present section 5021, that upon the unconditional discharge of the offender "the conviction shall be automatically set aside and held for naught." [37] The "held for naught" clause was deleted from the revised version of the draft adopted by

the Conference in 1946, and in its place was substituted "the [Youth] Division [of the Parole Board] shall issue to the [discharged] youth offender a certificate to that effect and the certificate shall have the same effect as a pardon." *Hearings on S. 1114 and S. 2609 Before a Subcommittee of the Senate Committee on the Judiciary,* 81st Cong., 1st Sess. 7 (1949) [hereinafter cited as "Hearings"]; Report of the Judicial Conference of Senior Circuit Judges 19 (1946). During the 1949 hearings before the Senate Judiciary Committee, that language was stricken, and the present wording was substituted.[38] While various conclusions have been drawn from this history,[39] one plausible explanation for the change in wording is that Congress deemed that the "pardon" clause would not effectively provide the youthful offender with the clean slate intended by the drafters.

However that may be, the judicial drafters of the Act [40] again and again empha-

---

**33.** The committee was composed of United States Circuit Court Judges John J. Parker (chairman), Learned Hand, and Orie L. Phillips, and United States District Judges Bolitha J. Laws, Carrol C. Hincks, John C. Collet, and Paul J. McCormick.

**34.** Report to the Judicial Conference of the Committee on Punishment for Crime, Proposed Draft of an Act to Provide a Correctional System for Adult and Youth Offenders (1942) [hereinafter "1942 Committee Report"].

**35.** Report of the Judicial Conference of Senior Circuit Judges 7–8 (1942).

**36.** Report of the Judicial Conference of Senior Circuit Judges 26 (1943).

**37.** 1942 Committee Report, *supra* note 34, at 20.

**38.** Judge Orie L. Phillips, one of the drafters of the proposed legislation, submitted a list of "technical amendments" which included striking from proposed section 5021 the words "and the certificate shall have the same legal effect as a pardon." *Hearings, supra* at 71. These amendments were adopted and passed without debate. 96 Cong.Rec. 8267·68 (1950). See *Expungement of Criminal Records, supra* note 20, at 557.

**39.** Thus, it has been suggested that, because the amendment has been described as technical in nature, see note 38 *supra,* the set-aside provision still has no more effect than a pardon

which does not eliminate the conviction but only ends further punishment. See *Knote v. United States,* 95 U.S. 149, 24 L.Ed. 442 (1877). Yet there is also evidence that the "pardon" language was eliminated because a pardon is traditionally and constitutionally an exclusively executive function. *Expungement of Criminal Records, supra* note 20, at 558, *citing* Schaefer, *The Federal Youth Corrections Act: The Purposes and Uses of Vacating the Conviction,* Fed. Probation, Sept. 1975, at 32 [hereinafter cited as "Schaefer 1"].

**40.** The government complains that the legislative history upon which appellant relies does not include statements of congressional sponsors of the legislation or other legislators, and that it is therefore entitled to little weight. See *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *United States v. United Mine Workers,* 330 U.S. 258, 276–277, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *United States v. Wrightwood · Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942). This argument, however, overlooks the fact that there *are no* statements by legislators in the legislative history of section 5021(b) which shed any light on the interpretation to be accorded the set-aside provision, and that the Act was primarily the product of the Judicial Conference and its committee. Thus the members of that committee are uniquely qualified to provide guidance on the meaning of the Act. It was presumably for this same reason that the Supreme Court relied almost exclusively upon their testimony in determining the legislative

sized that, in the words of Chief Judge Bolitha J. Laws of the United States District Court for the District of Columbia, a primary purpose of the proposed statute was to ensure that "committed youth offenders who earn their final discharge before the end of their maximum term have their records cleared and all their civil rights restored." *Hearings, supra* at 14. To that end, Judge Laws noted with approval that "when the [Youth Correction] Division turns them out ahead of their maximum sentence, this law blots out their sentence and lets them go without any stigma on their life." *Id.* at 19.

Chief Judge Orie L. Phillips, of the United States Court of Appeals for the Tenth Circuit, made the same point, stating that ". . . the Act does provide for the wiping out of the conviction if the youth is discharged, rehabilitated, and behaves himself well after his period of supervision. The purpose of that is to help him get a job and keep him from having to be turned down by a prospective employer because of the fact that he has a conviction." *Id.* at 70.[41] And Chief Judge John J. Parker, of the United States Court of Appeals for the Fourth Circuit, Chairman of the Committee, testified as to "one feature in this bill which is very salutory and that is if the youth offender is reclaimed . . . , they can strike out the sentence imposed on him and completely set aside his conviction so that he will not have a criminal record staring him in the face." *Id.* at 45.[42]

Accordingly, the various Circuits have consistently stressed both the rehabilitative aspects of the Act and its purpose to provide youthful ex-offenders a fresh start free of the economic and social disabilities attributable to a criminal conviction.[43]

intent with respect to the Act's sentencing provisions. See *Dorszynski v. United States,* 418 U.S. 424, 432 n. 8, 437–40, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). Indeed, H.R.Rep.No. 2979, 81st Cong., 2d Sess. 8 (1950) states that "the bill is the product of careful study by the Judicial Conference and committees appointed by it, working in collaboration with representatives of the Department of Justice and other agencies . . . notably the American Law Institute."

**41.** Judge Phillips' further statement, that the Act "does not entirely remove the difficulty but he can say to the prospective employer, 'I have gone through this thing. They think I am rehabilitated and have given me this clearance and I think I am rehabilitated and can make good,'" has, in the eyes of some courts including the court below, lent ambiguity to section 5021. While this statement, and in particular the phrase "does not entirely remove the difficulty," could conceivably be read as indicating that in Judge Phillips' view expungement would not be available under the Act, it could also be understood as referring only to the continued existence of the arrest record or to such other factors as newspaper files, credit records, or other unofficial references to the conviction.

**42.** In response to a solicitation by Senator Pat McCarran, Chairman of the Judiciary Committee, for views on the proposed bill, Judge Charles C. Wyche of the Western District of South Carolina wrote: "Another feature of this Act which appeals to me is the provision that a sentence shall be automatically set aside and held for naught upon the unconditional dis-charge of the youth offender, and that the authority shall issue to the youngster a certificate to that effect. I believe that a boy who makes one mistake should be permanently forgiven that mistake if his subsequent conduct indicates that he has changed his behavior. One blot on his record may cause him great harm when he applies for a position in later years." *Hearings, supra* at 117.

**43.** Even the United States Court of Appeals for the Eighth Circuit, which in *United States v. McMains, supra,* 540 F.2d at 389 held that the Act "does not authorize expunction of the record of a conviction which has been set aside pursuant to section 5021," did not disagree with this legislative purpose. See 540 F.2d at 388–89. *Accord United States v. Doe,* 556 F.2d 391 (6th Cir. 1977). Since *McMains* did not address the various possible connotations and consequences of either an expungement or a set-aside, it is not fully clear whether our holding today is inconsistent with the conclusions reached by the Eighth Circuit in that case. The court's statement that expunction would not "strike a balance between rehabilitation of youthful offenders and the important societal interests served by criminal record-keeping," 540 F.2d at 389, may suggest that it perceived expungement as something other than the remedy we order today, and to the extent that it did, we cannot accept its reading of the Act. (We also think it significant that the two-judge majority in *McMains* made no mention of a note in that court's prior *en banc* decision in *Brager v. United States,* 527 F.2d 895, 897 n. 1 (8th Cir. 1973) that "§ 5021 provides that upon

This Circuit in particular has long viewed the Act in that light. For example, in pointing out the significant differences between sentencing adult and youth offenders under federal law we stated in *Tatum v. United States,* 114 U.S.App.D.C. 49, 50–51, 310 F.2d 854, 855–56 (1962):

> . . . A youth offender committed under the provisions of the Youth Corrections Act upon his release unconditionally before the expiration of the maximum sentence imposed is entitled to have the conviction set aside . . . Thus apart from and more important than the other differences urged upon us, a person sentenced under the Youth Corrections Act can, by virtue of his own good conduct, be spared a lifelong burden of a criminal record.[44]

In *United States v. Dancy,* 166 U.S.App. D.C. 399, 402, 510 F.2d 779, 782 n. 11 (1975), we again emphasized that the

> [P]romise of *expungement* is an important one. '[t]he stigma of a criminal conviction may itself be a greater handicap in later life than an entire misspent youth' (emphasis added).

And in *United States v. Moore,* 158 U.S. App.D.C. 375, 426, 486 F.2d 1139, 1190 *cert.*

denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973) we stressed that

> " . . . *expungement* would help to avoid any possibility that the social stigma attached to ex-convicts might impede the rehabilitation of drug addicts when they return to the community. [This] result can be accomplished for age-eligible misdemeanants by disposition under the Federal Youth Corrections Act [§ 5021], which provides for probation as well as treatment in confinement, and which has a provision for *expungement* of conviction" (emphasis added).[45]

See also, *Stevenson v. United States,* 127 U.S.App.D.C. 43, 46, 380 F.2d 590, 593 *cert. denied,* 389 U.S. 962, 88 S.Ct. 347, 19 L.Ed.2d 375 (1967);[46] *Mestre Morera v. United States Immigration and Naturalization Service,* 462 F.2d 1030, 1032 (1st Cir. 1972); *United States v. Roberts,* 515 F.2d 642, 644 (2d Cir. 1975); *Cox v. United States,* 473 F.2d 334, 336 (4th Cir.) *cert. denied,* 414 U.S. 869, 94 S.Ct. 183, 38 L.Ed.2d 116 (1973); *United States v. Bronson,* 449 F.2d 302, 305–06 (10th Cir.) *cert. denied,* 405 U.S. 994, 92 S.Ct. 1268, 31 L.Ed.2d 463 (1971); *United States v. Mollet,* 510 F.2d 625, 628 (9th Cir. 1975).[47]

completion of a sentence or period of probation a youth offender may be able to have his conviction expunged from his record." Again, the apparent inconsistency may turn on the definition to be accorded "expunged".)

44. Significantly, the opinion noted that section 5021 "appears to provide greater relief than would a presidential pardon," since the latter merely "releases the offender from all disabilities imposed by the offense, and restores to him all his civil rights," while the former "acts to expunge the conviction." 114 U.S.App.D.C. at 51, 310 F.2d at 856 n. 2.

45. In *United States v. McDonald,* 156 U.S.App. D.C. 338, 350, 481 F.2d 513, 525 (1973), Judge Bazelon, concurring in part and dissenting in part, stated with respect to the Youth Corrections Act, "[f]inally, and far from least important, those benefits include the possibility of having the original conviction set aside and re-entering the world with a clean record."

46. Stevenson held that fingerprints acquired in connection with a Youth Corrections Act arrest and conviction, and already on file with the FBI, could be used in a subsequent criminal

proceeding, notwithstanding the set-aside of the Youth Act conviction. Our view therein, that "the Act calls for no more than that the 'conviction' shall be set aside, the appropriate conditions having been met," 127 U.S.App.D.C. at 46, 380 F.2d at 593, is consistent with our opinion today. See Part VII, *infra.*

47. Numerous district courts have specifically viewed section 5021 as authorizing the expungement of conviction records, *e. g., United States v. Benlizar, supra* note 11, slip op. at 9 n. 9; *United States v. Glasgow, supra* note 20, 389 F.Supp. at 224 n. 17; *United States v. Prianos,* 403 F.Supp. 766 (N.D.Ill.1975); *United States v. Caviness,* 239 F.Supp. 545, 553 (D.D.C.1965), others have suggested as much, *e. g., United States v. Borawski,* 297 F.Supp. 198, 200 (E.D. N.Y.1969); *United States v. Bailey,* 343 F.Supp. 76, 78 (W.D.Mo.1971), and at least one has ordered such expungement. *United States v. Cuttler,* No. 75–383–Cr–JE (S.D.Fla., March 4, 1979) (all official records, case files, and court records pertinent to the case except the non-public record retained by the Department of Justice, Washington, D.C.).

The Court of Appeals for the First Circuit aptly summed up the prevailing thinking in *Mestre Morera v. United States Immigration and Naturalization Service, supra,* 462 F.2d at 1032:

Section 5021 clearly contemplates more than a "technical erasure" . . . The clear purpose for the automatic setting aside of a youthful offender's conviction if he responds satisfactorily to treatment under the [Act] is to relieve him not only of the usual disabilities of a criminal conviction, but also to give him . . . a second chance free of a record tainted by such a conviction.

█ It is clear that if these purposes of the Act are to be effectuated, the set-aside provision must be accorded a liberal construction which allows the rehabilitated youthful offender a meaningful fresh start by protecting him from those "stigma" consequences of his conviction which impede

his reintegration into society, as distinguished from an interpretation which grudgingly focuses only on the removal of "legal" disabilities which are of more limited value to the youthful ex-offender seeking to reestablish a useful, productive, and law-abiding life. It is with these purposes in mind and in that spirit that we construe the statute today.

V

█ The government assumes that the youthful ex-offender can be made sufficiently whole by means of a simple notation in his official records that the conviction has been set aside and issuance of a certificate to that effect.[48] This assumption was unrealistic thirty years ago when the Act was passed, and is even more unrealistic now, in light of a heightened sense of individual privacy,[49] and a modern technology which has made possible computerized in-

48. The present practice is for the court probation office to notify the FBI records division of the issuance of the section 5021 certificate by means of a "Final Disposition Report." That division then makes an additional "disposition" entry on the record after the notation of the sentence previously imposed, adding the words "set aside." Schaefer 1, *supra* note 39, at 35. The clerk's office of the district court adds the certificate to the public file. Schaefer, *The Use of Expunged Convictions in Federal Courts,* 35 Fed.Bar J. 107, 117 (1976) [hereinafter cited as "Schaefer 2"].

49. The right to privacy, as we said in *Utz v. Cullinane, supra,* 172 U.S.App.D.C. at 82 n. 41, 520 F.2d at 482 n. 41, "should encompass a substantial measure of freedom for the individual to choose the extent to which the government could divulge criminal information about him, at least where no conviction has ensued and no countervailing government interest is demonstrated." See also, *Miller, Personal Privacy in the Computer Age: The Challenge of a New Technology in an Information-Oriented Society,* 67 Mich.L.Rev. 1091, 1107–1109 (1969). And, as was stated in *Tarlton v. Saxbe, supra,* 165 U.S.App.D.C. at 301, 507 F.2d at 1124 and 1124 n. 23, "government collection and dissemination of inaccurate criminal information without reasonable precautions to ensure accuracy could induce a levelling conformity inconsistent with the diversity of ideas and manners which has traditionally characterized our national life and found legal protection in the First Amendment . . . .. The reality of this danger is illustrated by the facts in *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d

938, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967); *Wilson v. Webster,* 467 F.2d 1282 (9th Cir. 1972); *Bilick v. Dudley,* 356 F.Supp. 945 (S.D.N.Y.1973); *Kowall v. United States,* 53 F.R.D. 211 (W.D.Mich. 1971); *Wheeler v. Goodman,* 298 F.Supp. 935 (W.D.N.C.1969); *Hughes v. Rizzo,* 282 F.Supp. 881 (E.D.Pa.1968)."

We agree with Judge Gesell's observation that, "[w]hile conduct against the state may properly subject an individual to limitations upon his future freedom within tolerant limits . . . ancient or juvenile transgressions long since expiated by responsible conduct, should not be indiscriminately broadcast under governmental auspices. The increasing complexity of our society and technological advances which facilitate massive accumulation and ready regurgitation of far-flung data have presented more problems in this area, certainly problems not contemplated by the framers of the Constitution. These developments emphasize a pressing need to preserve and to redefine aspects of the right of privacy to insure the basic freedoms guaranteed by this democracy . . . . . Systematic recordation and dissemination of information about individual citizens is a form of surveillance and control which may easily inhibit freedom to speak, to work, and to move about in this land. If information available to Government is misused to publicize past incidents in the lives of its citizens the pressures for conformity will be irresistible. Initiative and individuality can be suffocated and a resulting dullness of mind and conduct will

formation storage and retrieval and its liberal use by potential employers.[50]

The plain fact is that—irrespective of notations and certifications—unless the slate is wiped clean in such a way that the FBI will not disclose, and the youthful ex-offender whose conviction was set aside may legally deny, the existence of that previous conviction, he will almost inevitably and forever bear its stigma in terms of both social relationships and economic opportunities.[51] Anything less leaves him at best

become the norm . . . . In short, the overwhelming power of the Federal Government to expose must be held in proper check." *Menard v. Mitchell,* 328 F.Supp. 718, 725–26 (D.D.C. 1971), *reversed on other grounds, Menard v. Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974). See also *Morrow v. District of Columbia, supra,* 417 F.2d at 742; *United States v. Kalish, supra* note 11, 271 F.Supp. at 970. Cf. *Watkins v. United States,* 354 U.S. 178, 196–199, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *Dombrowski v. Pfister,* 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L.Ed.2d 22.

Partly for these reasons, the need to restrict the dissemination of criminal records is becoming more and more recognized. See, *e. g.,* 28 C.F.R. §§ 20.21(b), 20.33 (1978) (limiting the agencies to which, and the circumstances under which, disclosure of FBI criminal history records may be made); 28 C.F.R. § 20.32 (1978) (excluding from criminal history records information maintained by the Department of Justice on minor offenses and offenses committed by juveniles); *Morrow v. District of Columbia, supra* (District of Columbia's so-called Duncan Regulations do not permit the furnishing of arrest records not resulting in convictions to private employers).

**50.** It is common for federal criminal identification data to be widely disseminated, and used both inside and outside the criminal justice system. See 28 C.F.R. §§ 20.30 et seq. (1978); Judicial Response, *supra* note 18, at 852–53, 862. For example, section ·605 of the Fair Credit Reporting Act, 15 U.S.C. § 1681c (1976), provides (with some limitations) for the reporting of "[r]ecords of arrest, indictment, or conviction of crime" by consumer reporting agencies, particularly in connection with large credit transactions, certain life insurance policies, and employment. Citing this statute, the reporting of a "set aside," but unexpunged, Youth Corrections Act conviction resulting in the loss of a job, was upheld in *Fite v. Retail Credit Company,* 386 F.Supp. 1045 (D.Mont. 1975), *aff'd,* 9th Cir., 537 F.2d 384.

**51.** As Chief Justice Earl Warren wrote in his dissenting opinion in *Parker v. Ellis,* 362 U.S. 574, 593–94, 80 S.Ct. 909, 920, 4 L.Ed.2d 963 (1960); "Conviction of a felony imposes a *status* upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities." See also *Carafas v. LaValee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) *overruling Parker v. Ellis,* 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960); Note, *Employment of Former Criminals,* 55 Cornell L.Rev. 306 (1970). Private employers often avoid hiring applicants with criminal records, and there are even more formidable barriers where public employment or entry into licensed occupations is sought. The federal government, see, *e g.,* 7 U.S.C. § 12a(2)(B) (1976) (felons may be refused registration as futures commissions merchants and floor brokers), every State, see, *e. g.,* Pa.Stat.Ann. Tit. 63, §§ 9.1–1312 (Purdon 1968 & Supp.1978–79), and most municipalities, see E. McQuillin, Municipal Corporations § 26.74 (3d rev. ed. 1964), allow for the exclusion of ex-convicts from most regulated occupations. Such licensing has been held to be a valid exercise of local police power, *Dent v. West Virginia,* 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889), and may extend from the legal, *e. g.,* Ariz.Rev.Stat.Ann. §§ 32–201 to 275 (1956 and Supp.1978–79), and medical, *e. g.,* Ala.Code Tit. 46, §§ 258–97 (Supp.1973) professions to semi-skilled and unskilled workers, *e. g.,* Mich.Stat.Ann. § 14.528(59) [M.C.L.A. § 257.1209] (1970) (ambulance attendants). See *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898); *Barsky v. Board of Regents,* 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954); *De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960); but see *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). Generally neither suspension of sentence nor pardon will prevent exclusion from licensed employment, see, *e. g., Page v. Watson,* 140 Fla. 536, 192 So. 205 (1938); *Stone v. Oklahoma Real Estate Commission,* 369 P.2d 642 (Okl. 1962), which may be mandatory, *e. g.,* N.C.Gen. Stat. § 90–265 (1975) (physical therapist), discretionary, *e. g.,* N.C.Gen.Stat. § 90–14 (Cum. Supp.1977) (physician), or based on the conviction's proximity in time, *e. g.,* Mich.Stat.Ann. § 19.803 [M.C.L.A. § 451.213] (Supp.1978) (five years). Additionally, most, if not all, professions require applicants to prove good moral character. See R. Affeldt and H. Seney, *Group Sanctions and Personal Rights—Professions, Occupations and Labor Law,* 11 St. Louis L.J. 382, 399–414 (1967). While there are cases in which courts have concluded that denial of a license is unreasonable in light of the applicant's rehabilitation, *e. g., Tanner v. DeSapio,* 2 Misc.2d 130, 150 N.Y.S.2d 640 (Sup.Ct.1956), more often a conviction record is viewed as

only slightly better off than if his conviction had never been "set aside" at all.[52] Most employers cannot be expected seriously to consider the niceties of a set-aside certification; instead they will simply do what many have always done: they will refuse to "take a chance on an ex-convict."[53]

Thus, insofar as ex-offenders are concerned, we and they are confronted with a vicious circle. The public in general regards them as beyond redemption and offers them few opportunities for a decent livelihood in legal endeavors. The almost inevitable consequence is that many return to the world of crime, drugs, and the companionship of others similarly situated, eventually to be arrested and convicted again, thus fulfilling the prophecy of those who expect nothing better. The Youth Corrections Act was designed to break that chain, to give those young people who have not yet matured into hardened criminals an opportunity to break out into normal society, with jobs, opportunities, and freedom from the stigma of a criminal record.

Such a view of the Act is neither sentimental nor romantic; indeed, if one were to attempt to construct cost-benefit ratios, the

likelihood is that less harm will be done to society by channelling youthful offenders into legal, productive lives than would be by the alternative, niggardly approach which, to be sure, will protect an occasional employer from a youthful offender who has not reformed, but which will also condemn many other such offenders to a life of criminality and dependency at an enormous cost to them and to society as a whole.

In short, the inevitable result of the construction proposed by the government would be that, as often as not, the set-aside provision will be in the future, as in the past, hollow to the promise both to the individual who tries sincerely and energetically to rehabilitate himself and to society upon whom he is likely to be a continuing or a renewed burden—on the welfare rolls, in the criminal justice system, and in many other ways. In an ideal world, perhaps all ex-offenders should be so determined, so motivated as not to be discouraged by social and economic rebuffs; and potential employers, neighbors, and others with whom they might come into contact should regard the set-aside certificate as a definite statement that the slate has been wiped clean— but that is not likely to occur,[54] and we

---

conclusive evidence of bad character. Insofar as federal employment is concerned, the ex-offender whose conviction has been set aside under section 5021 may be slightly better off. The Civil Service Commission (and presumably its present successors) allows for the omission of "any conviction set aside under the Federal Youth Corrections Act or similar state authority" from the conviction question on its Standard Form 171 Personal Qualifications Statement. Similarly, the Federal Personnel Manual states that persons need not answer "yes" to questions regarding convictions if those convictions have been set aside under the Act. The Juror Qualification Questionnaire prepared by the Administrative Office of the United States Courts, however, disqualifies persons convicted of felonies (punishable by more than one year's imprisonment) unless their civil rights were restored by pardon or amnesty, but does not mention a section 5021 certificate. See Schaefer 1, *supra* note 39, at 33.

52. In such a circumstance, the ex-offender is faced essentially with a Hobson's choice: if, when asked about a conviction record, he answers in the affirmative, he will probably be denied employment despite the "clean slate"

the Youth Corrections Act promised him in return for good behavior; yet if he denies the existence of any such record he will be faced with the likelihood that—should the employer double-check, as many of them do—he will be denied both employment and an opportunity to explain because of the putative employer's feeling that one who misrepresents his past cannot be trusted. See Schaefer 1, *supra* note 39, at 34.

53. One study found that only eleven per cent of employers who were seeking to hire were willing to consider a person convicted of assault, and this percentage rose only to thirty-three with respect to applicants who had been acquitted. Schwartz & Skolnik, *Two Studies of Legal Stigma*, 10 Social Problems 133, 134–38 (1962) *cited in* Gough, *supra* note 22, at 153. See also, *Morrow v. District of Columbia, supra*, 135 U.S.App.D.C. at 173, 417 F.2d at 741; *Utz v. Cullinane, supra*, 172 U.S.App.D.C. at 80, 520 F.2d at 480.

54. Dean Joseph Lohman of the University of California School of Criminology, a former sheriff of Cook County, Illinois, has written:

refuse to construe the statute on that kind of artificial premise.[55]

## VI

Against this backdrop of the rehabilitative purposes of the Act and its design to reintegrate youthful ex-offenders into the productive segment of society, we balance the government's interest in maintaining conviction records. While it could be contended that the Congress has already taken that interest into account in enacting the set-aside provision, the fact is that neither the statute itself nor its legislative history addresses that issue. We have therefore independently examined the governmental interests cited by appellees and we are satisfied that the expungement remedy as herein defined may properly be applied without jeopardizing legitimate law enforcement concerns.

The government has stated its interests to be twofold: (1) the need to preserve an accurate record of that which has in fact occurred, i. e., not to "rewrite history;" and (2) the need to retain such a record for investigative and other law enforcement purposes.

With respect to the government's asserted interest in preserving an accurate historical record, it must be recalled initially that reference to the "expungement" of convictions in fact carries a wide range of connotations. See note 22 *supra*. While it has traditionally been viewed as technically importing only the physical destruction of rec-

ords[56] in modern usage, and as we construe it today,[57] it may be used to connote the removal of records from the general mass of law enforcement files where they are most likely to be accessible to the public. Under that interpretation, other evidence of the occurrence—such as records in segregated law enforcement files as well as transcripts and docket entries of court proceedings—would be retained. Thus, the fact of the conviction would be given no *legal* effect but at the same time it would not be obliterated as an *historical* event.

Moreover, it would be inaccurate to describe even the most drastic form of expungement in a pejorative sense as constituting a rewriting of history—as if such an action constituted a peculiar aberration from the mainstream of the laws and philosophical values inherent in a libertarian, non-Orwellian society. In a considerable variety of criminal and quasi-criminal contexts, both courts and legislative bodies have never hesitated to direct the denial for legal purposes of events that occurred in fact, whenever appropriate for reasons of public policy or equity.

Thus, grand jury indictments or special grand jury reports defamatory in content or otherwise improperly issued have frequently been ordered expunged, e. g., *Hammond v. Brown*, 323 F.Supp. 326 (N.D.Ohio 1971); *aff'd*, 450 F.2d 480 (6th Cir. 1971); *Application of United Electrical Radio & Machine Workers of America, et al.*, 111 F.Supp. 858 (S.D.N.Y.1953); *State v. Bramlett*, 166 S.C.

"There is too little concern with the stigmatizing and alienating effect of arrests of such violators [minor offenders, especially first offenders]. We equate them with bank robbers and murderers. Once a youngster has a police record, this fact, in the eyes of the law—and potential employers—is more real than the person himself. People stop looking at a young man. They look at his record, his 'sheet' as it is called. Over and over boys told me, 'It isn't me; it's the sheet. They won't listen to me.' We have pushed these boys on the other side of the law. They may well stay . . . ." Lohman, Upgrading Law Enforcement, 9 Police 19 (1965), *cited in* Gough, *supra* note 22, at 162.

**55.** The alternative view—that ex-offenders are inherently untrustworthy and that those who might come into contact with them are justified

in expecting a notice of their status—wholly contradicts the legislative purposes underlying the Act and the expectations of those who drafted and enacted it.

**56.** See, e. g., *Andrews v. Police Court*, 123 P.2d 128 (Cal.App.1942) *aff'd*, 21 Cal.2d 479, 133 P.2d 398 (Cal.1943); Schaefer 2, *supra*, note 48. According to Webster's Third New International Dictionary (1963), to "expunge" means to "to strike out, obliterate, or mark for deletion" or "to cause the physical destruction of" or "to treat or cause to be treated as non-existent." Compare *Grandison v. Warden*, *supra* note 11 (obliteration, removal to separate secure area not public, sealing, or returning to subject).

**57.** See Part VII *infra*.

323, 164 S.E. 873 (1932); court-ordered sealing of juvenile records is the prevailing practice in the majority of states, e. g., D.C.Code § 16–2335(c) (Supp. V 1973);[58] court-ordered sealing of arrest and/or conviction records is authorized by various state and federal statutes, e. g., Cal.Pen. Code § 1203.45 (Supp.1978) (young adult offenders); 21 U.S.C. § 844(b)(2) (1976) (certain first-time drug offenders);[59] police departments have been directed physically to expunge all references to an arrest, e. g., *Hughes v. Rizzo*, 282 F.Supp. 881 (E.D.Pa. 1968); the Attorney General has been ordered to destroy all arrest and identification records, including fingerprints and photographs, e. g., *United States v. Kalish*, 271 F.Supp. 968 (D.P.R.1967); the Civil Service Commission has been directed by the Supreme Court to expunge from its records a

**58.** D.C.Code § 16–2335(c) (Supp. V 1978) provides that "[u]pon the entry of the order, the proceedings in the case shall be treated as if they never occurred. All facts relating to the action including arrest, the filing of a petition, and the adjudication, filing, and disposition of the Division shall no longer exist as a matter of law. The Division, the law enforcement department, or any other department or agency that received notice under subsection (b) and was named in the order shall reply, and the person who is the subject matter of the records may reply to any inquiry that no record exists with respect to such person." See also Md. [Cts. & Jud.Proc.] Code Ann. § 3.828(c) (Supp. 1978); Neb.Rev.Stat. § 43–243 (1943); Okl. Stat. tit. 10, § 1506 (Supp.1978–79); Va.Code Ann. § 16.1–306 (Supp.1978).

**59.** Cal.Pen.Code § 1203.45 (Supp.1978) provides that certain persons convicted of a misdemeanor committed while under the age of eighteen "may petition the court for an order sealing the record of conviction and other official records in the case, including records of arrests," and if the order is granted, the "conviction, arrest or other proceeding shall be deemed not to have occurred, and the petitioner may answer accordingly any question relating to their occurrence." 21 U.S.C. § 844(b)(2) (1976) provides for the "expungement" of all recordation of arrest, indictment, information, trial, finding of guilt, dismissal, and discharge from all official records (with the exception of a non-public record to be retained by the Justice Department solely for court use in determining subsequent qualification under this statute) of certain first-time drug offenders. The statute specifically states that its effect is to restore the person, in contemplation of the law, to the status he occupied prior to the proceedings, and that he may answer questions addressed to them appropriately (in the negative). See also note 7, *supra*.

A number of statutes authorize expungement of conviction records only. Thus, Mich.Stat. Ann. § 28.1274(101) [M.C.L.A. § 780.621] (1978) provides that a person who pleads guilty or is convicted of not more than one offense before the age of twenty-one may after five years move the court to set aside the judgment, and § 28.1274(102) [M.C.L.A. § 780.622] pro-

vides that upon entry of such a set-aside order, the applicant shall "for purposes of the law" be deemed not to have been previously convicted. (Notice must be served upon the prosecuting attorney, who must be given the opportunity to contest the setting aside of the judgment.) Minn.Stat.Ann. § 638.02(2) (Supp.1979) allows any person convicted of a crime to petition the board of pardons upon discharge for a "pardon extraordinary," which restores all civil rights and sets aside and nullifies the conviction, "purging" the offender. It specifically provides that petitioner shall never thereafter be required to disclose the conviction at any time or place other than in subsequent judicial proceedings. N.J.Stat.Ann. § 2A:164–28 (Supp. 1978) allows one convicted of certain crimes to petition for expungement ten years after the date of conviction, completion of sentence, or release from parole, provided he has no subsequent convictions. While the statute requires notice to be served upon the prosecutor and police departments concerned, no provision is made for the expunging or sealing of police and enforcement agency records. Tex.Code Crim. Proc.Ann. art. 42.13, § 7 (1966) provides that upon completion of probation following conviction of a misdemeanor, the court shall set aside the finding of guilt which may thereafter not be considered *for any purpose* (italics in statute) except to determine entitlement to probation in a trial for a subsequent offense. And section 306.6 of the Model Penal Code (Proposed Final Draft # 1, 1961) states that in certain cases of young adult offenders, successful probationers, or parolees, the court may order that as long as the defendant is not convicted of another crime, the judgment "shall not thereafter constitute a conviction for the purpose of any disqualification or disability imposed by law because of the conviction of a crime," and in certain cases of discharge from probation or parole before the expiration of the maximum term thereof or of a defendant who has fully satisfied the sentence and has since led a law-abiding life for at least [five] years, the court may enter an order vacating the judgment of conviction (although this would not justify a defendant in stating that he had not been convicted of a crime).

finding of the Loyalty Review Board as to a federal employee's loyalty, *e. g., Peters v. Hobby, supra*; public school officials have been ordered to expunge all references to a teacher's suspension and dismissal for "insubordination" based on a controversial reading assignment to her class, *e. g., Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala. 1970); adverse findings of an agency with respect to employment have been ordered stricken, *e. g., Smith v. District Unemployment Compensation Board*, 140 U.S.App. D.C. 361, 435 F.2d 433 (1970); the U.S. Navy has voluntarily expunged records of alleged disloyalty, *e. g., Newell v. Ignatius*, 132 U.S.App.D.C. 252, 407 F.2d 715 (1969); and a memorandum in the FBI's files that a high school student doing a social studies assignment "had been in contact" with the national headquarters of the Socialist Workers Party has been ordered expunged, *e. g., Paton v. LaPrade*, 524 F.2d 862 (3rd Cir. 1975). *See generally* cases cited notes 8–15 *supra*.

Similar directions have been given for similar reasons from time immemorial in innumerable civil, family, and evidentiary matters, sometimes pursuant to statutory law, in other instances under the courts' general equitable powers. Thus, courts seal items of evidence and they strike improper evidence, *e. g., International Products Corp. v. Koons*, 325 F.2d 403 (2d Cir. 1963); *United States v. Perna*, 197 F.Supp. 853 (D.Conn.1961); scandalous pleadings are routinely ordered sealed or destroyed, *e. g.*, Rule 12(f), F.R.Civ.P., Wright & Miller, *Federal Practice and Procedure: Civil* § 1382 n.18 (1969); juries are instructed to disregard the testimony of witnesses or the comments of counsel and to treat them as if they had never been uttered, *e. g.*, Mathes and Devitt, Federal Jury Practice and Instructions §§ 78.01–.04 (1965); unconsummated marriages and those between parties incapable of entering into the marriage relationship are annulled and treated as if they had never existed, see *Clayton v. Clayton*, 231 Md. 74, 188 A.2d 550 (1963); *Simmons v. Simmons*, 57 App.D.C. 216, 19 F.2d 690 (1927); adopted children are treated for all purposes as if they were the natural children of the persons adopting them, see, *e. g.*, Va.Code Ann. § 63.1–233 (1973); D.C. Code § 16–312 (1973); [60] contracts found to be void are treated as though they had not been entered into, see Calamari and Perillo, Contracts § 1–11 at 18 (2ed 1977); corporations are treated for many legal purposes as "persons" although they obviously are not natural beings, see *Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972); *Wooddale, Inc. v. Fidelity & Deposit Co.*, 378 F.2d 627 (8th Cir. 1967)—the list could be extended almost indefinitely. In all of these instances, legislative or judicial bodies found compelling policy reasons for ignoring in law what had occurred in fact, and for that reason the "rewriting of history" label was quite properly not affixed to any of them; we decline—as Congress did—to apply it in this instance where equally compelling interests are present.

## VII

The government does, however, have a legitimate need for maintaining criminal records in order to efficiently conduct future criminal investigations. Law enforcement authorities have an interest in knowing, for example, that a definite suspect in a crime under investigation had previously been arrested or convicted, especially if for a similar offense. Likewise, police investigators will be greatly assisted if they are able to check whether persons residing or having been observed at the situs of an offense involving a particular modus operandi had previously been arrested or convicted of an offense involving the same modus operandi.

The expungement remedy as defined herein will not deprive the government of the criminal records of Youth Act offenders

**60.** To this end, a new birth certificate may be issued. See, *e. g.*, Va.Code Ann. § 63.1–221.1 (1973).

for these purposes. Arrest records, and other matters not covered by section 5021, will, of course, be retained in any event.[61] Moreover, as we view expungement under the Act, conviction records, too, will remain available to the government for use in legitimate criminal investigations. In order to accommodate these governmental interests and at the same time minimize any risk to the youthful ex-offenders' interests which Congress intended to protect, the following procedures will apply.

■ Once a district court issues its order setting aside a conviction under section 5021 and transmits that order to the Federal Bureau of Investigation,[62] it will not be sufficient for the Identification Division of that Bureau, as in the past, merely to enter the words "set aside" on its records. The set-aside must be actual: the conviction

records must be physically removed from the central criminal files[63] and placed in a separate storage facility[64] not to be opened other than in the course of a bona fide criminal investigation by law enforcement authorities[65] and where necessary for such an investigation. These records may not be used by appellees for any other purpose, nor may they be disseminated to anyone, public or private, for any other purpose.

■ Once notified of the entry of a set-aside order, appellees and their agents will be required to respond in the negative to any and all inquiries concerning the set-aside conviction. Similarly, the ex-offender whose conviction is or has been set aside under section 5021, may legally reply in the negative to any and all questions concerning his former conviction.[66]

61. As noted *supra*, appellant urges that the logic of an effectuation of the rehabilitative purposes of the Act must lead to an expungement of his arrest record. To be sure, some of the adverse consequences sketched out above may also flow from the existence of an unexpunged arrest record. However, questions regarding arrests or searches of widely-scattered court records are not nearly as prevalent as inquiries concerning convictions at the FBI, nor is arrest data as freely disseminated as conviction data. See, e. g., 20 C.F.R. § 20.21(b) (Appendix at 251) (1978). In any event, as stated in Part II *supra*, the Act does not authorize the expungement of appellant's arrest record nor are facts and circumstances alleged which could invoke the court's inherent equity power to order such an expungement.

62. Apparently, this is presently done by the probation officers of the various courts. However, the Bureau's responsibility will be the same if the order is brought to its attention by some other court official or by the ex-offender himself. If the ex-offender is the source of the information, appropriate verification inquiries may, of course, be made to the court.

63. As a practical matter, the arrest and conviction may at present be recorded on the same sheet of paper. If that is the case, suitable arrangements will have to be made to adopt a system which will comply with the holding herein. Appellees may, for example, decide that this could best be accomplished by setting the entire present record aside and preparing a new record, not reflecting set-aside convictions, to be retained in the FBI's central criminal files. We leave the precise manner in which this can best be carried out, as well as the establishment of suitable guidelines regarding access to

the set-aside files, to appellees, subject to the approval of the District Court on remand.

64. See *Grandison v. Warden, supra* note 11, 423 F.Supp. at 115; *District of Columbia v. Hudson*, Case No. 9312 (D.C.App. July 19, 1979).

65. This is similar to the system established by 21 U.S.C. § 844(b) (1976), which provides for the expungement of the records of certain first-time narcotics offenders from all public files but requires the maintenance of a non-public file for the limited purpose of determining future eligibility under that section. See also *Utz v. Cullinane, supra*, 172 U.S.App.D.C. at 69–70, 520 F.2d at 469–70; *Sullivan v. Murphy, supra*, 156 U.S.App.D.C. at 63, 478 F.2d at 973; section (b)(7) of the Privacy Act, 5 U.S.C. § 552a(b)(7) (1976) (allows disclosure of records "to another agency or instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought").

66. See *Tatum v. Morton, supra* note 10, 562 F.2d at 1285 n.17; *Wheeler v. Goodman, supra* note 10; *United States v. Benlizar, supra* note 11, at n.25. See also *Mestre Morera v. United States Immigration and Naturalization Service, supra* at 1032; *Sullivan v. Murphy, supra; Washington Mobilization Committee v. Cullinane, supra* note 9, at 218–19; *Schaeffer 1,*

By appropriately balancing the needs of law enforcement agencies and the interests of rehabilitated youthful offenders under the Act, these procedures ensure that agencies will have access to their files where necessary to conduct criminal investigations, but that appellant and others like him will not have the set-aside convictions on their records and they will thus be spared the economic, social, and legal consequences which impair their reintegration into society.[67] Such a balancing of interests has been found to be appropriate in similar contexts, *e. g., Sullivan v. Murphy, supra,* 156 U.S. App.D.C. at 63, 478 F.2d at 973; *Morrow v. District of Columbia, supra,* 135 U.S.App. D.C. at 173–174, 417 F.2d at 741–742; *Utz v. Cullinane, supra,* 172 U.S.App.D.C. at 75, 520 F.2d at 475 n.10; *Chastain v. Kelley, supra,* 167 U.S.App.D.C. at 15, 510 F.2d at 1236,[68] and we find it appropriate here.

*Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.*

---

*supra* note 39, at 31; Cal.Pen.Code § 1203.45 (Supp.1978); Minn.Stat.Ann. § 638.02(2) (Supp.1979); 21 U.S.C. § 844(b)(2) (1976). In view of this disposition of appellant's request for injunctive relief, it is not necessary to reach the declaratory judgment question.

**67.** For the reasons stated in note 61, *supra,* neither the retention of the youthful ex-offenders' records by the courts in which the criminal proceedings occurred, nor their lack of immunity from answering in the affirmative to inquiries, if any, concerning arrests, should work a significant hardship on them. In these respects, the various interests of the government outweigh the relatively slight risk that these matters will cause problems to ex-offenders.

**68.** "Expungement . . . is a versatile tool: expungement of only some records, from some Government files, may be enough, as may the placing of restrictions on how the information contained in the records may be used. It is a tool which must be applied with close attention to the peculiar facts of each case. Only in that way can it effect a proper reconciliation of the competing interests of the Government in retaining information relevant to job performance, and of the individual in having it forgotten. But it must be rationally and selectively responsive to those interests." 167 U.S.App. D.C. at 15, 510 F.2d at 1236.