**Percy Donald LIVINGSTON, Appellant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE.**

**No. 83–2251.**

United States Court of Appeals, District of Columbia Circuit.

Submitted Aug. 17, 1984.

Decided March 29, 1985.

As Amended April 5, 1985.

Percy D. Livingston, pro se.

Joseph E. diGenova, U.S. Atty., Washington, D.C., with whom Royce C. Lamberth, R. Craig Lawrence and Charles F. Flynn, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge.

Percy Donald Livingston appeals the order of our district court granting summary judgment to the Justice Department in his suit urging the court to expunge the records of two prior arrests. We vacate the district court's order. The court adjudicated on the merits a case that ought to have been transferred to a more convenient forum. Moreover, the district court misconstrued and misapplied the law of this circuit regarding expungement of arrest records.

## I. BACKGROUND

Appellant was first arrested in 1945, at the age of eighteen. Currently listed on his FBI arrest record ("rap sheet") are thirty entries.[1] Livingston is now serving a twenty-year sentence in the federal facility in Talladega, Alabama following conviction on 1979/80 drug charges.

Apparently in the belief that his lengthy arrest record had influenced the trial judge to mete out the maximum sentence, and that he was continuing to be prejudiced by certain allegedly improper entries in his rap sheet while in prison, Livingston initiated efforts to have those entries expunged. One agency to which Livingston wrote requesting expungement, the Savannah, Georgia Police Department, explained that "because the original charge originated from" the "United States Federal Marshall's [sic] Office," the record of the arrest in question "would have to be cancelled by that agency."[2] Livingston then filed *pro se* in the United States District Court for the Middle District of Georgia papers captioned "Motion to Expunge Records in the Case of *Percy Donald Livingston vs. United States Marshal Office et el.* [sic] ...."[3] He alleged that certain entries on his rap sheet were "at present causing permanent and irreparable harm to my chances for making parole" and that "[t]he unwarranted *Stigma* to Movant ... by far ... outweighs any Justification for this incidence [sic] being entered into Movant's F.B.I. rap-sheet."[4] The continuing presence of these allegedly improper entries on his record, Livingston asserted, violated his constitutional rights.[5]

1. That record is summarized here in order that the entries challenged by appellant may be viewed in context:

   robbery by force (10/45); Dyer Act violation (9/46); robbery (11/46); punch board, sharks (4/49); suspicion of larceny (6/49); embezzlement (8/49); grand larceny & attempting a holdup (8/49); assault & battery (4/50); worthless check (6/50); making & possessing molds for counterfeit coins (10/52); flim flam (3/54); flim flam (4/55); investigation of embezzlement (4/56); investigation of larceny (pinball machine) (7/56); investigation of burglary (3/57); destruction of property (pinball machine) (10/57); malicious mischief (4/58); investigation for being a fugitive (10/61); burglary (1/62); grand larceny (3/62); investigation for grand larceny (4/62); destruction of property (tampering w/slot machines) (4/62); investigation for breaking & entering (laundry), vagrancy, loitering (10/63); grand larceny (2/64); breaking and entering w/intent to commit a grand larceny (6/66); unlawful flight to avoid prosecution—murder (12/66); possession & conspiracy to distribute a controlled substance,

   racketeering, tax evasion (12/79); racketeering (4/80).

2. Exhibit D, "Motion to Expunge Erroneous Records," Record Entry No. 1, Percy Donald Livingston v. United States Marshal [later Livingston v. Department of Justice], Civil No. 83–0188 (D.D.C. filed Jan. 25, 1983) [hereinafter cited as Civil No. 83–0188].

3. Exhibits B, C, *id.*

4. *Id.* (emphasis in original).

5. In fact, Livingston's papers in the Middle District of Georgia did not make clear whether he objected on constitutional grounds to the arrests themselves or to the maintenance of a record of the arrests. He wanted the arrests "duly expunged from records" because, *inter alia*, "the charge was entertained and sustained as a violation of due process and equal protection of the law of the Nation as established under the principles of law set forth by Amendment 14, Section 1, of the United States Constitution also under the laws set forth in the Fifth and Sixth Amendment...." *Id.*

Within several weeks Livingston received the following letter from Chief Judge Wilbur D. Owens, Jr. of the Middle District of Georgia, who had sentenced him two years before:

Dear Mr. Livingston:

The clerk's office has called my attention to your motions to expunge records as received by them on May 12, 1982.

From reading your motion it seems that you desire to cause the Parole Board to be unable to consider matters that are included in your prior record. Since your prior record is not a record of this court, this court could not expunge any part of it even if it wished to do so.

Since your motion does not concern anything that is within the court's jurisdiction, it is returned so that you may research the situation and file it with the appropriate court or agency.[6]

Livingston's subsequent "research" culminated in our district court's receipt of his *pro se* "Motion to Expunge Erroneous Records."[7] The district court promptly indicated its concern that the matter could best be adjudicated in the district where the relevant records were located.[8] On January 31, Livingston was ordered to show cause why his case should not be transferred to the Middle District of Georgia.[9] It was in response to this order that our district court first learned of the earlier attempt to file in that very district and of Chief Judge Owens' letter. Our district court thereupon noted: "Rule to Show Cause discharged. Case will remain in U.S. District Court for the District of Columbia."[10]

Livingston filed what he styled a "Traverse Reply Brief," in response to defendant's motion to dismiss, and our district court appointed counsel to represent the prisoner.[11] Subsequently, the motion to dismiss was denied, an amended complaint was filed, the Department of Justice was substituted as defendant, discovery was undertaken, cross-motions for summary judgment were filed, and a stipulated statement of facts entered into the record. The proceedings below now permit of the following summary.

Livingston's initial *pro se* complaint sought expungement of three entries from his lengthy arrest record. One of the challenged entries was, according to counsel below, voluntarily expunged by the defendant and therefore "no longer at issue in this litigation."[12] The two remaining entries in the FBI record that Livingston urged the district court to order expunged were:

(1) An arrest on September 12, 1946, in Macon, Georgia, for alleged violation of the Dyer Act, 18 U.S.C. § 2311 *et seq.*;

(2) An arrest on December 7, 1966, in Macon, Georgia, for alleged unlawful flight to avoid prosecution for murder, pursuant to 18 U.S.C. § 1073.

Appellant was nineteen years old when he and a friend drove a 1941 Chevrolet, which the FBI believed to be stolen, from Detroit to Macon in late August 1946. The friend had obtained title to the car, without appellant's participation, by threatening to turn its owner in to the police following a homosexual encounter. While driving through Georgia, Livingston and his friend stole Georgia license plates from a parked

---

**6.** Exhibit B–1, "Response to Show Cause Issue," Record Entry No. 3, Civil No. 83–0188.

**7.** *See supra* note 2.

**8.** "Leave to file without prepayment of costs granted," Record Entry No. 1, Civil No. 83–0188.

**9.** "Order to Show Cause," Record Entry No. 2, *id.*

**10.** "Rule to Show Cause Discharged," Record Entry No. *3, Civil No. 83–0188. Immediately thereafter, summonses were issued to the United States Marshal, the United States Attorney,

and the Attorney General of the United States at their respective offices in Washington.

**11.** "Order," June 8, 1983, Record Entry No. 8, Civil No. 83–0188.

**12.** Plaintiff's Memorandum of Points and Authorities in Support of His Motion for Summary Judgment 1 n. 1 [hereinafter cited as Pl.Mem.]. That entry related to a 1949 arrest on a charge of being a material witness to violations of the White Slave Traffic Act.

vehicle, put them on the Chevrolet, sold it soon thereafter for $1,050 and split the proceeds. Knowing all of the foregoing facts, FBI agents filed a Dyer Act (interstate transportation of a stolen vehicle) complaint against Livingston on September 12. On October 15, the U.S. Attorney in Macon declined prosecution and the complaint was dismissed.[13]

As to the second arrest record challenged, listed as "UFAP-Murder," the following summary by Livingston's counsel appears essentially accurate:

It is undisputed that Plaintiff was indicted on charges of murder in Toombs County, Georgia on September 7, 1966. It is also undisputed that the indictment was *sealed*. Moreover, during the entire period from the date of the indictment to his arrest, Plaintiff was working in his hometown of Macon, Georgia. The FBI knew, at least as early as November 8, that Macon had been his residence. And, a Macon newspaper reported on December 7, the date of his arrest, that he would be acting as a pall bearer at a funeral that day. Finally, not only did the Federal Court in Macon order the Federal charges against Plaintiff dismissed on December 21, 1966, but the underlying state law charge was dismissed on February 28, 1967, and never reinstated.[14]

In the district court, Livingston contended that because the charges to which the two challenged arrest records referred were "without basis" and were dismissed before trial, "there is no sound basis for their continued retention."[15] Continued maintenance of the records would, plaintiff asserted, cause him "unusually substantial harm."[16] He noted that the sentencing

judge in 1980 (Chief Judge Owens) had "specifically reflected on" the arrest record "in toto" in meting out the maximum 20-year sentence, that "negative information can affect future parole board decisions," and that "while in prison, [Livingston] has been denied out custody, denied transfer to a camp, denied furlough and denied preferred jobs."[17] "Finally, upon release, these records, especially because they involve a charge as serious as murder, are bound to affect Plaintiff's ability to find employment and otherwise resume a normal life."[18] Livingston asserted that the government has no need to maintain these records and had demonstrated "no particularized interest" in records dating back 37 and 17 years, respectively.[19]

On cross motions for summary judgment, the district court held for the defendant Justice Department. The district judge found the "touchstones for decision" in this court's opinion in *Doe v. Webster*, 606 F.2d 1226 (D.C.Cir.1979). He relied heavily in his two-page order on the following dictum from *Webster*:

[A]lthough there are indeed many instances in which courts have ordered expungement of arrest records in the exercise of their inherent equitable powers, all of these cases involved either a lack of probable cause coupled with special circumstances, flagrant violations of the Constitution, or other unusual and extraordinary circumstances.[20]

Finding none of these circumstances in this case, the district judge concluded that "the government's need for a record of the arrest far outweighs any potential harm to the plaintiff."[21] He granted defendant's motion for summary judgment and dis-

---

13. Stipulated Facts, Appendix to Brief for Appellee at 8, 9.

14. Pl.Mem. at 3 (emphasis in original) (citations to record omitted).

15. *Id.* at 6.

16. *Id.* at 7.

17. *Id.* at 8, 9.

18. *Id.* at 9.

19. *Id.* at 10.

20. *Doe v. Webster*, 606 F.2d 1226, 1230 (D.C.Cir. 1979) (footnotes omitted).

21. Order, Civil No. 83–0188, October 27, 1983, *reprinted in* Appendix to Appellee's Brief at 5, 6.

missed the action with prejudice. This appeal followed.

## II. DISCUSSION

■ It is well established, and undisputed by the parties to this case, that courts have the inherent, equitable power to expunge arrest records.[22] In *Sullivan v. Murphy*,[23] this court held that expungement can and should be ordered "when that remedy is necessary and appropriate in order to preserve basic legal rights."[24] In *Doe v. Webster*,[25] upon which the decision below was based, we reaffirmed that "[t]he power to order expungement is part of the general power of the federal courts to fashion appropriate remedies to protect important legal rights."[26] Our holding in that case rested, however, on a *statute* providing for expungement *not of an arrest but of a conviction*. In ordering the expungement of appellant's *conviction* for a marijuana offense committed while a minor, the court explicitly did so pursuant to the set-aside provisions of a federal statute designed to promote the rehabilitation of juvenile offenders.[27]

■ Any expungement decision requires a delicate balancing of the equities and, as the *Webster* court emphasized, "depends on the facts and circumstances of the case"; "there must be a logical relationship between the injury and the requested remedy."[28] When sitting in equity, moreover, the court must "mould each decree to the necessities of the particular case," emphasize "[f]lexibility rather than rigidity," and retain "[t]he qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation...."[29]

■ In this case, it does not appear that the injury to Livingston has been very great; nor does it appear that an equitable remedy, if one is appropriate, would need to be very great. But that is not to say that no remedy would be in order, regardless of the facts Livingston might adduce. The limited record facts before us do suggest that as to one of the arrest records at issue, Livingston may indeed have been injured and, moreover, that the injury may be on-going. They suggest that despite appellant's long history of run-ins with the law, perhaps even because of them, a federal court's equitable "remedy [may be] necessary and appropriate in order to preserve basic legal rights."[30]

---

22. This circuit has emphasized that "[t]he judicial remedy of expungement is inherent and is not dependent on express statutory provision...." *Menard v. Saxbe,* 498 F.2d 1017, 1023 (D.C.Cir.1974).

23. 478 F.2d 938 (D.C.Cir.), *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

24. *Id.* at 968. *See also Chastain v. Kelley,* 510 F.2d 1232, 1234 (D.C.Cir.1975); *Tarlton v. Saxbe,* 507 F.2d 1116 (D.C.Cir.1974).

25. 606 F.2d 1226 (D.C.Cir.1979).

26. *Id.* at 1230 n. 8.

27. *Id.* at 1230, 1233–38. Although the *Webster* court did decline to expunge the record of the *arrest* in that case, its decision in equity was clearly influenced by the *validity* of the arrest and of the conviction which followed. *Id.* at 1231. In the instant case there was no conviction, and it is precisely the validity of appellant's arrest which is being challenged. Therefore, *Webster* would not preclude expungement.

28. *Id.* at 1231.

29. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also Swann v. Board of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Sullivan v. Murphy,* 478 F.2d 938, 966 (D.C.Cir.1973).

30. *Sullivan v. Murphy,* 478 F.2d at 968. The criteria that have evolved in this circuit for balancing the equities in cases of this sort would *not,* we think, justify an order that the Dyer Act entry be expunged. Appellant's admitted theft of a license plate to place on the car, traveling in the car across state lines, and splitting the proceeds from its sale may well have constituted probable cause for his arrest. Dismissal of the complaint, without more, will not justify expungement of the arrest record. Even individuals acquitted at trial are not entitled to expungement of their records "as a matter of course." *Webster,* 606 F.2d at 1231. Moreover—and sharply distinguishable from the arrest for "UFAP-Murder"—the Dyer Act charge is not *qualitatively* different from dozens of other arrests included in appellant's record (and unchallenged here). It does not have the great capacity for prejudicial impact inherent in an unjustified association with a capital crime.

■ In particular, the record entry of appellant's arrest for "UFAP-Murder" may well be appropriately expunged or modified so as to avoid its obvious potential to stigmatize him unfairly.[31] In this case, the entry appears doubly suspect. First, record evidence suggests that Livingston never left the state of Georgia between the time the sealed grand jury indictment was handed up and his arrest; that federal agents knew his whereabouts; that Livingston made no attempt to hide, much less flee across state lines as required by the federal unlawful flight statute, 18 U.S.C. § 1073; and that he did not know, and had no way of knowing, that he was wanted for murder. Second, the murder indictment was quashed by the state court, appellant was never reindicted, and the state bench warrant and federal "unlawful flight" charges were dismissed. Nevertheless, in even a quick scan of appellant's lengthy rap sheet, that six-letter word stands out and attracts the reader's attention. It is the only reference to a capital crime. It is an emotion-laden word.[32]

■ In adjudicating Livingston's case, a federal court would be required to balance the harm to the appellant against the government's interest in maintaining a record of the arrest for "UFAP-Murder." We do *not* attempt such an adjudication, however, because the necessary balancing is likely to require critical additional facts.[33] Obviously, the events underlying the arrests, the decisions not to prosecute, and any evidence of harm to the appellant, can be best explored where the facts arose. These critical facts are properly ascertained not in the District of Columbia, but in the Middle District of Georgia. That is the forum to which this case ought to have been, and must now be, transferred.[34]

31. This court has previously noted the destructive potential of arrest records, i.e., that "dismissed, abandoned or withdrawn arrest records are no more than gutter rumors when measured against any standard of constitutional fairness to an individual and, along with records resulting in an acquittal are not entitled to any legitimate law enforcement credibility whatsoever." *Utz v. Cullinane,* 520 F.2d 467, 479 (D.C.Cir. 1975) (quoting *United States v. Dooley,* 364 F.Supp. 75, 77 (E.D.Pa.1973)). An additional dictum in *Dooley* is on point in the instant case: "charges which the government fails or refuses to press or which it withdraws ... lose any tendency to show probable cause and should not be boot-strapped into any unearned and undeserved significance." 364 F.Supp. at 77. We need not go so far to conclude that retention, without modification, of the "murder" record in this case may be fundamentally unfair.

32. The government suggests that for expungement of an arrest record to be justified, a plaintiff's record must be otherwise unblemished. Brief of Appellee at 9 n. 10. Principles of fundamental fairness, however, preclude distinguishing between plaintiffs with long rap sheets and those with only one entry. Indeed, it is hard to say whom a wrongfully maintained arrest record injures more—a model citizen or a prisoner at the mercy of penal authorities at whose discretion (influenced by the rap sheet at their disposal) prison privileges or parole may be granted or denied.

33. Most importantly: Why was the Georgia murder indictment quashed? As this court noted in *Webster:*

If there was no crime, or if the government concedes that the defendant was not in any way implicated in its commission, it would appear to have no need for the records at all. If, however, the charges are dismissed for some other reason (*e.g.,* a plea bargain) or if the defendant is tried and acquitted on a "technical" ground, there may arguably be a need to retain the record for investigatory purposes in the event that another, similar offense is committed.

606 F.2d at 1231 n. 15. In this case the district court in Georgia might uncover on transfer, *see infra* note 34 and accompanying text, the reasons that the state murder indictment was quashed and the reasons appellant was arrested for "unlawful flight" rather than on the murder charge itself.

34. Transfer is authorized by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *See, e.g., Translinear, Inc. v. Republic of Haiti,* 538 F.Supp. 141 (D.D.C. 1982); *LaBrier v. A.H. Robins Co., Inc.,* 551 F.Supp. 53 (D.D.C.1982). As to the language in the statute authorizing transfer only to "any other district or division where it might have been brought," we do not believe that the letter Livingston received from Chief Judge Owens represented an actual determination of any jurisdictional issue so much as a failure on the part of Livingston's *pro se* papers to convey with sufficient clarity the nature of his complaint and of the relief sought. (Nor does it appear

### III. CONCLUSION

For the reasons expressed in this opinion, the order of the district court is vacated. The case is remanded to the district court, with instructions to transfer the action to the United States District Court for the Middle District of Georgia, pursuant to 28 U.S.C. § 1404(a).

*So ordered.*

that Livingston's claim was actually litigated on the merits in the Georgia district court. Judge Owens simply suggested in his letter that Livingston seek expungement elsewhere.)

Now that proceedings in our district court, facilitated by the appointment of counsel, have remedied the defects in Livingston's pleadings, the district court in Georgia, as transferee, may decide this action on its merits as one initiated with the filing of Civil No. 83–0188 in the District of Columbia on January 25, 1983. (Should the Georgia trial judge determine on transfer that Livingston is precluded from "relitigating" in that forum, or if the relief he requests is denied following consideration of the merits, appellant will have recourse to the United States Court of Appeals for the Eleventh Circuit.)