SCHUSSHEIM, APPELLEE, *v*. SCHUSSHEIM, APPELLANT.

[Cite as *Schussheim v. Schussheim,* 137 Ohio St.3d 133, 2013-Ohio-4529.]

*Courts have the inherent authority to expunge and seal records when a case involves unusual and exceptional circumstances and when the interests of the party seeking expungement outweigh the legitimate need of the government to maintain the records.*

(No. 2012-1235—Submitted April 23, 2013—Decided October 16, 2013.)

APPEAL from the Court of Appeals for Warren County, No. CA2011-07-078, 2012-Ohio-2573.

_____

**O'DONNELL, J.**

**{¶ 1}** The issue in this case is whether a trial court has the authority to seal records relating to a dissolved civil protection order ("CPO") without express statutory authorization to do so.

**{¶ 2}** Alan Schussheim has appealed a decision of the Twelfth District Court of Appeals that affirmed the trial court's denial of his application to expunge and seal the record of proceedings regarding a dissolved CPO. Ohio has no statute either authorizing or precluding the sealing of records relating to CPOs in adult proceedings.

**{¶ 3}** In *Pepper Pike v. Doe*, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), we recognized that courts have inherent authority to grant the judicial remedy of expungement and sealing of records in "unusual and exceptional circumstances." This case is another where unusual and exceptional circumstances exist because the complainant who originally filed for the CPO subsequently filed a motion to dissolve it, which the court granted, and thereafter provided an affidavit in support of the application to expunge and seal the records

pertaining to it. Thus, in accordance with *Pepper Pike*, we hold that a trial court has the inherent authority to grant an application to expunge and seal a record pertaining to a dissolved CPO in an adult proceeding when unusual and exceptional circumstances exist. Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

**Factual Background and Procedural History**

**{¶ 4}** On July 13, 2009, Michelle D. Henneman, f.k.a. Michelle D. Schussheim, filed a petition for a domestic-violence CPO against Schussheim, her husband, pursuant to R.C. 3113.31. She alleged that he had threatened and shoved one of their daughters and had pushed Henneman to the floor. A magistrate granted an ex parte CPO the day Henneman filed the petition requesting it. Eight days later, the magistrate held a hearing with both parties present and modified the order but specified that it would remain in effect until July 13, 2010.

**{¶ 5}** Shortly thereafter, Henneman moved to dissolve the order, and on August 14, 2009, the trial court dismissed the case and dissolved the CPO.

**{¶ 6}** In April 2011, Schussheim filed an application to expunge and seal the record of the CPO proceedings. He asserted that he and Henneman were going through a divorce at the time she obtained the CPO, that he was never charged with domestic violence, and that the existence of the record violated his constitutional right to privacy and could have adverse effects on his employment in regard to wage increases, promotions, and transfers. Significantly, Henneman filed an affidavit in support of Schussheim's application, averring that she did not object to sealing the record and that she believed expungement was in the best interest of herself and their children.

**{¶ 7}** After conducting a hearing, the magistrate recommended that the application be denied. The magistrate noted the absence of any statutory

authority to expunge or seal records in civil cases or CPOs and noted that the Twelfth District Court of Appeals has never held that courts have the authority to seal CPO records. The magistrate further decided that even if *Pepper Pike* applied, sealing the record would be inappropriate under the balancing test set forth in that case. In adopting the magistrate's decision, the trial court agreed with the magistrate's analysis and concluded that any adverse economic consequences were speculative and insufficient to justify sealing the records.

{¶ 8} Schussheim appealed to the Twelfth District Court of Appeals, where a divided court held that the trial court lacked statutory authority to expunge the CPO records and declined to apply the doctrine of judicial expungement established in *Pepper Pike* to noncriminal cases or proceedings. 2012-Ohio-2573, ¶ 16, 18. The dissenting judge asserted that pursuant to *Pepper Pike*, courts have the inherent authority to order judicial expungement in unusual and exceptional circumstances and that a court should give the accused in a dismissed ex parte CPO case the opportunity to be heard on his request for this judicial remedy and should conduct the balancing test set forth in *Pepper Pike*. *Id.* at ¶ 29, 38.

{¶ 9} On appeal to this court, Schussheim contends that (1) a domestic-violence CPO is subject to judicial expungement pursuant to *Pepper Pike* and also because such an order implicates the accused's constitutional rights to due process and equal protection, (2) the court should use the balancing test set forth in *Pepper Pike* to determine whether to grant this judicial remedy, and (3) a prima facie showing of "actual harm" or "actual negative consequences" is not required before the application of the balancing test described in *Pepper Pike.*

{¶ 10} No opposing brief has been submitted.

### Law and Analysis

{¶ 11} In *Pepper Pike,* 66 Ohio St.2d at 376-377, 421 N.E.2d 1303, we recognized that courts have inherent authority to expunge and seal criminal

records in "unusual and exceptional circumstances" and noted that the basis for the authority is the constitutional right to privacy. The state charged the appellant in *Pepper Pike* with criminal assault based upon statements made by her ex-husband and the wife of her ex-husband. *Id.* at 374. The appellant subsequently filed a civil complaint for defamation. *Id.* at 374-375. The parties agreed to dismiss the assault charge with prejudice, in exchange for dismissal of the civil defamation action. *Id.* at 375. The appellant then sought expungement of the arrest record relating to the assault charge. *Id*.

{¶ 12} At the time the motion for expungement was filed in *Pepper Pike*, a person who had been convicted of an offense could seek expungement and sealing of criminal records pursuant to statute, but no statute authorized expungement and sealing of records of those charged with, but not convicted of, criminal offenses. *See id.* at 376, fn. 4. Therefore, we considered whether a trial court had the power to grant the judicial remedy of ordering the expunging and sealing of records in the absence of legislative authorization to do so. *Id.* at 376. Based on the constitutional right to privacy, we recognized that courts have the power to grant this remedy and established a balancing test requiring courts to weigh "the interest of the accused in his good name and right to be free from unwarranted punishment against the legitimate need of government to maintain records." *Id.* at 377.

{¶ 13} Applying that standard, we held that because the dismissal of an assault charge with prejudice constituted "unusual and exceptional circumstances," the trial court appropriately exercised its power to grant this judicial remedy. We further explained that "[w]here there is no compelling state interest or reason to retain the judicial and police records, such as where they arise from a domestic quarrel and constitute vindictive use of our courts, the accused is entitled to this remedy." *Id.* We cautioned that this was an "exceptional case" and

that courts should not construe the decision "to be a carte blanche for every defendant acquitted of criminal charges." *Id.*

{¶ 14} Similar to *Pepper Pike*, no statutory authorization exists for the court to expunge and seal records relating to a dissolved CPO in adult proceedings. In accordance with our recognition in *Pepper Pike* of a court's inherent power to expunge and seal criminal records absent statutory authority, we hold that a court has the inherent authority to order the expungement and sealing of records that relate to a dissolved CPO in "unusual and exceptional circumstances." In deciding whether to grant this remedy, the court must determine whether the "interest of the accused in his good name and right to be free from unwarranted punishment" outweighs the "legitimate need of government to maintain records." *Id.*, 66 Ohio St.2d at 377, 421 N.E.2d 1303. And "[w]here there is no compelling state interest or reason to retain the * * * records," the applicant is entitled to this remedy. *Id.*

{¶ 15} This appears to be a case involving "unusual and exceptional circumstances," because the complainant who filed the petition for a CPO later moved to dissolve the CPO and now avers that she believes expungement is in the best interest of herself and her children. In addition, the fact that no related criminal charges were filed is also a factor to be weighed on remand. The trial court can consider whether Schussheim's interests outweigh the government's need to maintain the records.

{¶ 16} The inherent authority of a court to expunge and seal a record does not turn on whether a proceeding is criminal or civil. Rather, the determination is whether "unusual and exceptional circumstances" exist and whether the interests of the applicant outweigh the legitimate interest of the government to maintain the record.

**Conclusion**

{¶ 17} Courts have the inherent authority to expunge and seal records when a case involves unusual and exceptional circumstances and when the interests of the party seeking expungement outweigh the legitimate need of the government to maintain records. Such unusual and exceptional circumstances appear to exist in this case, as the complainant who petitioned the court for an ex parte CPO later moved to dissolve the CPO and submitted an affidavit that expungement was in the best interest of herself and her children. Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

PFEIFER, DONOFRIO, and O'NEILL, JJ., concur.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., dissent.

GENE DONOFRIO, J., of the Seventh Appellate District, sitting for KENNEDY, J.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 18} I join Justice French's dissent, which cogently explains the substantive problems with the majority's decision. I write separately to address what I perceive as the majority's disturbing judicial activism. The majority improperly creates a new mechanism for expungement that is contrary to the public-policy decisions made by the General Assembly as evidenced by the statutes it enacted, and it does so by using *Pepper Pike v. Doe*, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), as a smokescreen.

*The statutory scheme*

{¶ 19} The majority begins its analysis where it also should end: by recognizing that there is no statutory authorization for courts to seal records

relating to civil protection orders ("CPOs") *in adult proceedings*. That the majority must modify its assertion with the clause "in adult proceedings" is fatal to its rationale.

{¶ 20} By asserting that there is no statute that precludes sealing of records in adult proceedings and therefore the court may rule to allow it, the majority fails to acknowledge the significance of the General Assembly's enactment of a comprehensive statutory scheme that permits the sealing of records related to CPOs but limits the applicability of the sealing provision to juvenile proceedings. If the legislature had wanted to afford adults the same sealing provision, it would have done so.

{¶ 21} In 2010, after more than a year of consideration, debate, and revisions, the 128th General Assembly enacted Am.Sub.H.B. No. 10 ("H.B. 10"), which is known as the Shynerra Grant Law and provides for the issuance of a CPO against a juvenile. The legislation was enacted in response to the death of Grant, who in 2004 secured the only judicial protection available to her, a no-contact order from the juvenile court, after her ex-boyfriend broke her jaw. *Parents of Murdered Teens Say New Law Will Help Courts Curb Youth Violence*, Hannah Report (Mar. 17, 2010); *Senate Passes Bills on Juvenile Stalking, Railroad Crossing Regulation*, Hannah Report (Mar. 9, 2010). At that time, the law did not provide Grant the option of obtaining a CPO against him because they were both minors. *Id.* Within the year, Grant's ex-boyfriend fatally shot her and killed himself. Provance, *New Ohio Statute to Safeguard Teens*, The Blade (Mar. 17, 2010), available at http://www.toledoblade.com/local/2010/03/17/New-Ohio-statute-to-safeguard-teens.html#sSmUDJFjZiyUyLvt.99 (accessed Oct. 2, 2013).

{¶ 22} H.B. 10 created a proceeding in juvenile court for obtaining a CPO that parallels the proceeding applicable to adults. But in recognition of the unique considerations present when dealing with children, the General Assembly also enacted several special rules applicable only to juvenile proceedings. *See* the

Judicial Impact Statement prepared by the Ohio Judicial Conference regarding H.B. 10 (May 8, 2009) 2-3, available at http://www.ohiojudges.org/ Document.ashx?DocGuid=3d216d2d-b9e0-435b-89c6-e86b557b28e8 (accessed Oct. 2, 2013) (offering the conference's support for the legislation and emphasizing that the provision establishing exclusive, original jurisdiction over CPO proceedings against juvenile respondents is appropriate because common pleas courts "do not have the range of additional dispositionary remedies available to juvenile courts"). The sealing provision was one such measure. *See id.* at 5 (recognizing that the legislature wished to provide for sealing of records relating to CPOs in juvenile proceedings and suggesting that it could accomplish that goal by making applicable existing law that provided for sealing and expungement of juvenile court records relating to delinquency actions and traffic offenses).

{¶ 23} Notably, when H.B. 10 was first introduced in 2009, it contained no expungement procedure or sealing provision. 2009 H.B. No. 10, available at http://www.legislature.state.oh.us/bills.cfm?ID=128_HB_10_I (accessed Oct. 2, 2013). "One of the stumbling blocks in getting the bill passed was some lawmakers' concerns that a single incident or a false accusation could haunt an individual into adulthood." Provance, *New Ohio Statute to Safeguard Teens*, The Blade (Mar. 17, 2010), available at http://www.toledoblade.com/local/ 2010/03/17/New-Ohio-statute-to-safeguard-teens.html#sSmUDJFjZiyUyLvt.99 (accessed Oct. 2, 2013).

{¶ 24} The bill was approved unanimously by the House of Representatives, 153 Ohio House Journal, First Regular Session, 631-632, but only after an expungement procedure was incorporated in R.C. 2151.34(E)(6), Sub.H.B. No. 10, unofficial version available at http://www.legislature. state.oh.us/bills.cfm?ID=128_HB_10_PH (accessed Oct. 2, 2013). The Senate replaced the expungement procedure with a sealing provision, Am.Sub.H.B. No.

10, unofficial version available at http://www.legislature.state.oh.us/bills.cfm?ID= 128_HB_10_PS (accessed Oct. 2, 2013), and unanimously approved the bill, 153 Ohio Senate Journal, First Regular Session, 2498-2500; the House then approved the Senate amendments by a vote of 96 to 1, 153 Ohio House Journal, Second Regular Session, 2459-2462.

{¶ 25} The bill's sponsor, Representative Edna Brown, explained that the sealing provision was added to ensure that juvenile respondents had "the opportunity for second chances." *Parents of Murdered Teens Say New Law Will Help Courts Curb Youth Violence*, Hannah Report (Mar. 17, 2010). Likewise, Senator Bill Seitz explained that the juvenile-proceeding sealing provision, as enacted, was needed to "ensure that youths aren't saddled for life with the fault of one childhood mistake." *Senate Passes Bills on Juvenile Stalking, Railroad Crossing Regulation,* Hannah Report (Mar. 9, 2010).

{¶ 26} After the enactment of H.B. 10, there is no question that the legislature intended that records relating to CPOs issued against adults stay in the public domain. Even though H.B. 10 modified some provisions applicable to both adult and juvenile proceedings, e.g., R.C. 3113.31(A)(3)(a)(ii) (expanding the definition of "family or household member" to include a foster parent) and modified some laws governing adult proceedings in order to make them applicable to the new juvenile proceedings, e.g., R.C. 3113.31(L) (providing that a person who violates a CPO is subject to a criminal prosecution *or a delinquent-child proceeding*), the General Assembly did not authorize sealing of CPO records in adult proceedings.

{¶ 27} The maxim of statutory construction "expressio unius est exclusio alterius" means "the expression of one thing is the exclusion of the other." "For example [according to the maxim], the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote." *Black's Law Dictionary* 661

(9th Ed.2009). Likewise, the law that juveniles are entitled to seal CPO records implies that adults are not entitled to seal CPO records.

{¶ 28} Application of the maxim in this case is also consistent with the apparent intent of the legislators. *State ex rel. Curtis v. DeCorps*, 134 Ohio St. 295, 298-299, 16 N.E.2d 459 (1938) (explaining that the maxim is inapplicable when its use would defeat legislative intent). In enacting H.B. 10, the General Assembly drew a bright line between adult CPO proceedings and juvenile CPO proceedings. To that end, H.B. 10 modified the procedure for obtaining a CPO in adult proceedings by requiring that the petition allege that the respondent is 18 years of age or older. R.C. 2903.214(C)(1). And H.B. 10 gave juvenile courts exclusive jurisdiction over petitions for CPOs against minors. R.C. 3113.31(A)(2). Finally, the act provided that CPOs issued by juvenile courts against juvenile respondents are invalid once the respondent attains 19 years of age. R.C. 3113.31(E)(3)(a). Together, those provisions make clear that juveniles are not subject to the harsher adult procedures and adults cannot avail themselves of the more forgiving juvenile procedures.

{¶ 29} A judicial remedy may not contravene the public policy expressed in duly enacted, constitutional legislation. *E.g., Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶ 8, citing *Painter v. Graley*, 70 Ohio St.3d 377, 385, 639 N.E.2d 51 (1994). But rather than abide by the line drawn by the General Assembly, the majority opinion circumvents the Ohio Revised Code for the simple reason that it can.

Pepper Pike: *the smokescreen*

{¶ 30} The majority blithely asserts as support for its holding that "[i]n *Pepper Pike v. Doe*, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), we recognized that courts have inherent authority to grant the judicial remedy of expungement and sealing of records in 'unusual and exceptional circumstances.' " Majority opinion at ¶ 3. In so doing, the majority ignores the unambiguous wording of the

first paragraph of the syllabus in *Pepper Pike*: "The trial courts in Ohio have jurisdiction to order expungement and sealing of records *in a criminal case* where the charges are *dismissed with prejudice* prior to trial by the party initiating the proceedings." (Emphases added.) There was never a criminal case against Schussheim for his actions against Michelle D. Schussheim, n.k.a. Henneman, and one of their children. And the civil proceedings against him were dismissed without prejudice. Thus, *Pepper Pike* is inapposite.

{¶ 31} The majority extends *Pepper Pike* to civil proceedings. And it contends that its authority to do so springs from the Constitution. As Justice French explains, there is no constitutional right to expungement. Justice French's dissenting opinion at ¶ 76.

{¶ 32} The majority claims that the authority comes from the constitutional right to privacy, which *Pepper Pike* stated was the "basis" for expunging records relating to a false criminal charge. *Pepper Pike* at 377. In so holding, *Pepper Pike* cited *Roe v. Wade*, 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding that "the right of personal privacy includes the abortion decision"); *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (declaring unconstitutional a state law that provided for the posting in liquor establishments of names of persons to whom intoxicating beverages could not be sold on the ground that persons subject to the state law were first entitled to notice and an opportunity to be heard); and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (overturning the convictions of two Planned Parenthood employees for violating state law that prohibited dissemination of information about birth control on the ground that the law violated the right to privacy).

{¶ 33} *Pepper Pike* recognized that the right to privacy justified expunging records that a court generated because a third party had perpetrated fraud on the court. The majority here expands *Pepper Pike* while ignoring that

the state has a legitimate interest in maintaining public records that relate to valid court proceedings.

*This case is not "unusual or exceptional"*

{¶ 34} That this case is not a criminal case is not the only fact that distinguishes it from *Pepper Pike*. It is equally important to recognize that this case is not, as in *Pepper Pike*, a case in which court records arose from a person's use of the court as a vindictive tool to harass. *Pepper Pike*, 66 Ohio St.2d at 377, 421 N.E.2d 1303 (holding that there is no compelling state interest in retaining criminal records in the unusual and exceptional circumstance where the records "arise from a domestic quarrel *and* constitute vindictive use of our courts" [emphasis added]). In fact, the contrary conclusion must be drawn here.

{¶ 35} In her petition for the CPO, Henneman alleged that her then husband, Alan C. Schussheim, had committed two acts of domestic violence against their daughter on two separate days. Henneman stated under oath that on July 2, 2009, "[i]n a hotel room on vacation, our daughter was unsuccessfully trying to open medicine. My husband harassed her over it, then backed her up against * * * a wall, yelled at her 1 inch from her face then pushed her into the wall. I intervened and was subsequently shoved backward against a bed which I fell over and onto the floor." Henneman also stated under oath that nine days later, on July 11, 2009, Schussheim "threatened and intimidated our daughter, shoved her against [a] wall in a closed room."

{¶ 36} Two days after the second incident of abuse, Henneman successfully petitioned the court for an ex parte domestic-violence CPO. The judge who heard her allegations and had the opportunity to evaluate her credibility in making the assertions against Schussheim ordered him to vacate the home and stay at least 100 yards away from Henneman and their daughters.

{¶ 37} In response, Schussheim did not move to set aside the CPO on the ground that it was incorrect or inappropriate, even though a local rule expressly

provided for an expedited hearing on such a motion and even though any modification thereby could "be made retroactive to the effective date of the ex parte order." Loc.R. 2.9A of the Court of Common Pleas of Warren County, Domestic-Relations Division. Instead, Schussheim filed a facially frivolous motion to dismiss the matter for improper venue because the family was in Pennsylvania at the relevant times.

{¶ 38} On July 21, 2009, the court held a hearing in response to the CPO. Schussheim attended, represented by counsel. After the hearing, the court modified the CPO to permit Schussheim visitation with the daughters—only if it was supervised—and to permit limited communications by e-mail between Schussheim and Henneman.

{¶ 39} The court determined that the CPO should otherwise remain in full force, and it extended the CPO's effect to July 13, 2010. Several weeks later, Henneman moved the court to dissolve the CPO. After a hearing, the court dismissed the CPO without prejudice.

{¶ 40} Nearly two years later, Schussheim moved to expunge and seal the record of the CPO proceedings. In support of his motion, he filed Henneman's affidavit, which was printed on Schussheim's attorney's letterhead. In its entirety, the affidavit provides:

> 1. I am the Petitioner in the above captioned matter;
>
> 2. I have no objection to the application of Alan C. Schussheim's Application to Expunge and Seal the Record of Case #09DV4460;
>
> 3. Alan C. Schussheim was never charged with an act of domestic violence related to this incident or at any other time during our marriage;

4. Alan C. Schussheim and I co-parent our two minor children;

5. I believe it would be in the best interest of both myself, Alan and our children if the record of proceedings in this matter was expunged and sealed.

**{¶ 41}** This case is ordinary and usual. There is nothing to indicate that this CPO was not issued for valid reasons.

**{¶ 42}** The underlying CPO case was dismissed without prejudice, giving rise to the inference that Henneman's motion to dissolve the CPO was based on changed circumstances rather than on a recantation of the facts she swore to in order to obtain the CPO. That Henneman no longer needed the CPO after four weeks does not change the fact that she needed it in the first instance. And that she shortly thereafter notified the court that the CPO should be dissolved gives rise to the inference that she had responsibly, rather than vindictively, used the courts to secure only the protection that she needed for only the time period that she needed it.

**{¶ 43}** With regard to Schussheim's application to expunge that he filed two years later, Henneman's affidavit states, without explaining, that she has "no objection" to Schussheim's application because it would be in the family's best interest to seal the record. She states in her affidavit that Schussheim was never charged with domestic violence in connection with the allegations contained in the CPO petition, but she does not state that he never committed the domestic violence described. Henneman has never recanted the allegations of domestic abuse and never claimed to have sought the CPO for incorrect or inappropriate reasons.

**{¶ 44}** Moreover, Schussheim has never denied the acts described in the underlying petition. Notably absent from the record is any affidavit from

14

Schussheim stating that the allegations set forth in the CPO petition are untrue. One would imagine that Schussheim would have readily sworn out such a statement if he could have done so truthfully.

{¶ 45} What, then, would justify sealing the records in this case? Henneman is entitled to express her lack of opposition to Schussheim's application, but the fact that she does not oppose his application does not entitle him to relief. *See Pepper Pike*, 66 Ohio St.2d at 377, 421 N.E.2d 1303 (explaining that exceptional circumstances that justify sealing criminal records exist where the records relate to a vindictive use of our courts).

{¶ 46} There is no need to remand this case for an application of the *Pepper Pike* balancing test because even under *Pepper Pike*, a trial court's authority to expunge is limited to cases "where such unusual and exceptional circumstances make it appropriate to exercise jurisdiction over the matter." *Pepper Pike* at paragraph two of the syllabus. Such circumstances do not exist here. Nevertheless, the majority remands for exactly that purpose, and in doing so, it makes the heavy-handed assertion that "unusual and exceptional circumstances appear to exist in this case." Majority opinion at ¶ 17.

{¶ 47} That assertion is curious both in light of this record and in light of the fact that the trial court already applied the *Pepper Pike* balancing test and determined that Schussheim was not entitled to expunge the records. After concluding that *Pepper Pike* did not apply in this case, the magistrate explained:

> Even, however, applying the balancing test of *Pepper Pike v. Doe*, the request to seal the record in this case is denied. Here, the only reasons [Schussheim] provided for sealing the record is that the case was dismissed and that there have been no further acts or conduct of domestic violence and no criminal charges pending and that he fears the record could inhibit future employment.

**{¶ 48}** Accordingly, the magistrate recommended denying the application to seal. The trial court adopted that recommendation, over Schussheim's objections.

**{¶ 49}** Is there any reason to believe that the outcome will be different on remand? If so, the majority has not only extended *Pepper Pike* but has also redefined "unusual and exceptional." In any event, the majority opinion is pure legislation.

**{¶ 50}** This case perfectly illustrates the problem with the judiciary involving itself in policy-making.

*No adversarial testing*

**{¶ 51}** This case was litigated without the benefit of adversarial debate. And Schussheim's attorney, Jerry H. Shade, glossed over some points that must be highlighted.

**{¶ 52}** Attorney Shade represented to this court in his brief that "[t]he incident that formed the basis for the ex-parte order did not actually involve domestic violence, but was exaggerated so that [Henneman] could secure tactical advantage prior to filing for divorce." He repeated this assertion at oral argument. The record, however, suggests that that assertion is not true.

**{¶ 53}** Contrary to Shade's assertion, the acts alleged in the CPO constituted domestic violence. *See* R.C. 2919.25(A) through (D) (defining domestic violence). According to the petition, twice within two weeks, Schussheim shoved one of his daughters against a wall. But Shade repeatedly asserted that "there was no violence alleged." That is simply not true. The acts of domestic violence plainly involved physical violence.

**{¶ 54}** Shade also represented that Henneman had exaggerated the incidents of domestic violence in order to gain an advantage in an upcoming divorce. That assertion is totally without support in the record. In fact, the

16

opposite appears to be true. As I have already explained, there is every indication that the CPO was issued for valid reasons. Henneman did not object to the records' being expunged. That position does not translate into a recantation of the allegations or a confession of improper motive in securing the CPO.

{¶ 55} Yet Shade represented to the court during oral argument that Henneman's affidavit, which was printed on Shade's letterhead, stated that the allegations contained in the CPO petition were not true. It is difficult to believe that Shade would not have been aware of the inaccuracy of that statement when he made it to the court.

{¶ 56} Finally, Shade repeatedly referred to the ex parte order issued in this case. In doing so, he failed to mention that eight days after the court issued the ex parte CPO, it conducted a hearing to give Schussheim an opportunity to respond to the ex-parte order. Schussheim was present at that hearing, as was his counsel, James Whitaker, who was Shade's law partner at the time. That hearing provided an opportunity for Schussheim to be heard. And it resulted in the court's issuing an additional order, and that order reflects the court's determination that the CPO should remain in effect for a year. Schussheim also wants that record to be sealed.

{¶ 57} The sparse and limited information before this court stands in sharp contrast to the extensive and expansive information that was before the General Assembly when it in enacted H.B. 10. The rule of law that this court issues in this case will apply to CPO cases throughout Ohio.

{¶ 58} In enacting H.B. 10 and limiting the sealing provision to juvenile proceedings, the General Assembly heard from opponents and proponents of the bill, including numerous experts in domestic violence and the law. The legislators also considered testimony from domestic-violence victims. The bill was drafted with input from the Juvenile Judges Association and the Family Violence Prevention Center Advisory Council of the Ohio Department of Public Safety.

*Bills Would Change Ohio's 'F' for Efforts to Protect Teens from Dating Violence,* Hannah Report (Mar. 24, 2009).

{¶ 59} We, on the other hand, heard from one lawyer on one side of one case.

{¶ 60} With this limited information, we cannot know whether the majority's new law is good public policy for Ohio. As a practical matter, there is great potential for unintended consequences in the majority's decision. Most obviously, it increases the risk that respondents will use fear, intimidation, false promises, or threats to procure favorable affidavits from domestic-violence victims.

*Conclusion*

{¶ 61} Our democracy is not designed to permit four justices to heedlessly override the studied policy judgment of 129 legislators and one governor. Unfortunately, the majority fails to exercise the judicial restraint on which the design relies. Because I do not condone the majority's judicial activism, I dissent.

{¶ 62} But I am left with the lingering question of how far the majority will go to bury these records for Schussheim. Will it order this opinion to be sealed if Schussheim prevails on remand?

LANZINGER, J., concurs in the foregoing opinion.

_____

**FRENCH, J., dissenting.**

{¶ 63} I cannot agree that *Pepper Pike v. Doe*, 66 Ohio St.2d 374, 421 N.E.2d 1303 (1981), supports the new judicial power announced by the majority. The majority conflates a court's inherent power over its own records with "expungement," a statutory remedy affecting records held by other branches of government and carrying a license to conceal information from the public. We have missed the opportunity to recognize *Pepper Pike* for what it was—a narrow,

short-lived, judge-made "fix" to Ohio's nascent criminal expungement statutes. Therefore, I must respectfully dissent.

### Record "Expungement" and Pepper Pike

{¶ 64} "Expungement" is a legislative construct with no universally applied definition. It stems from a correctional philosophy that gained momentum in the 1950s and 1960s, when a minority of states enacted laws to allow those with juvenile-delinquency records or criminal-conviction records to avoid the social stigma attached to those records by allowing courts to order the records erased or sealed. Gough, *The Expungement of Adjudication Records of Juvenile and Adult Offenders: A Problem of Status*, 1966 Wash.U.L.Q. 147, 148-149 (1966). Despite their varying approaches, rationales, and terminology, expungement statutes generally allowed certain offenders to apply to expunge, delete, annul, erase or seal a record of conviction or of adjudication of delinquency. *Id*. at 149-150.

{¶ 65} Ohio followed suit, enacting legislation allowing expungement of juvenile-adjudication records in 1969, *see* former R.C. 2151.358, Am.Sub.H.B. No. 320, 133 Ohio Laws, Part II, 2040, 2066, and expungement of adult-conviction records in 1974, *see* former R.C. 2953.32, Am.Sub.S.B. No. 5, 135 Ohio Laws, Part I, 70 ("S.B. No. 5"). In its original form, former R.C. 2953.32 authorized an adult first-time offender to apply to the sentencing court for the "expungement of the record of his conviction" after a specified period of time. Former R.C. 2953.32(A), S.B. No. 5 at 70. The statute described "expungement" as a court-ordered "seal[ing]" of official records and "delet[ing]" of index references pertaining to a criminal conviction. Former R.C. 2953.32(C), S.B. No. 5 at 70-71. An order of expungement restricted the purposes for which law-enforcement officers could inspect the records, restored "all rights and privileges not otherwise restored by termination of sentence or probation," and prohibited employment applications from asking about the existence of expunged

convictions. *See* former R.C. 2953.32(D), 2953.33(A), and 2953.33(B), S.B. No. 5 at 70-72. The General Assembly replaced the term "expungement" with "sealing" in 1979, Am.Sub.H.B. No. 105, 138 Ohio Laws, Part I, 1638; however, "expungement" remains a common colloquialism used to describe the process. *See Pepper Pike* at 378 (referring to R.C. 2953.32 as "Ohio's criminal expungement statute"); *State v. LaSalle*, 96 Ohio St.3d 178, 2002-Ohio-4009, 772 N.E.2d 1172, ¶ 3, fn. 2.

{¶ 66} Some jurisdictions criticized the emerging expungement statutes because they did not also apply to persons charged with but not convicted of a crime. Several courts, concerned that arrest records may be as stigmatizing as conviction records, invoked a "narrow" power of expungement in the absence of statutory authority. *United States v. Linn*, 513 F.2d 925, 927 (10th Cir.1975), and cases cited therein; *see also Commonwealth v. Malone*, 244 Pa.Super. 62, 68, 366 A.2d 584 (1976) (noting the disabilities that may result from "the mere fact of an arrest, even if followed by acquittal or complete exoneration"). Courts reserved this "inherent equitable" power for unusual and extraordinary circumstances, such as when the arrest was intended to harass or amounted to a flagrant constitutional violation. *Doe v. Webster*, 606 F.2d 1226, 1230 (D.C.Cir.1979).

{¶ 67} We followed these jurisdictions in *Pepper Pike*, 66 Ohio St.2d 374, 421 N.E.2d 1303. The defendant-appellant in that case, Jane Doe, had been arrested on a misdemeanor assault charge, with the complaining witness being the wife of her ex-husband. *Id.* at 374. The parties eventually agreed that the assault charge against Doe would be dismissed in exchange for Doe's agreement to dismiss a defamation action against her ex-husband and his wife. *Id.* at 374-375. Doe then moved to expunge her arrest record in the case, but the trial court denied her motion on the grounds that it lacked jurisdiction over the motion. *Id.* at 375. At the time, R.C. 2953.32 authorized the sealing of conviction records for certain

first-time offenders, but no statute provided a comparable remedy for persons who had been found not guilty or who had had the charges against them dismissed.[1]

{¶ 68} We reversed, holding that "trial courts in Ohio have jurisdiction to order expungement and sealing of records in a criminal case where the charges are dismissed with prejudice prior to trial by the party initiating the proceedings." *Id*. at paragraph one of the syllabus. Given "the inherent lack of precision in the term 'expungement,' " we adopted the remedy set forth in R.C. 2953.32(C) and (F), which authorize a trial court to order sealed all official records and all index references pertaining to the case, but allow the government to retain the arrest record "in its appropriate files." *Id*. at 377-378, and fn. 5. We cautioned, however, that the expungement of such records should be used only in the "exceptional case, and should not be construed to be a carte blanche for every defendant acquitted of criminal charges in Ohio courts." *Id*. at 377. "When exercising this power, the court should use a balancing test which weighs the privacy interest of the defendant against the government's legitimate need to maintain records of criminal proceedings." *Id*. at paragraph two of the syllabus.

{¶ 69} The narrow remedy we recognized in *Pepper Pike*—i.e., expungement of arrest records in the absence of statutory authority—existed for less than three years before the General Assembly enacted R.C. 2953.51 et seq., which authorize courts to seal criminal records following an acquittal, dismissal, or no bill. Am.Sub.H.B. No. 227, 140 Ohio Laws, Part I, 2382, 2386. Pursuant to R.C. 2953.52, a trial court must, consistent with *Pepper Pike*, "[w]eigh the interests of the person in having the official records pertaining to the case sealed against the legitimate needs, if any, of the government to maintain those records."

---

1. There was, however, a statute permitting expungement in cases in which a misdemeanor arrest resulted in an agreed bail forfeiture, former R.C. 2953.42, Am.S.B. No. 192, 137 Ohio Laws, Part I, 460, and a statute allowing certain persons to seek the return of the fingerprint record made upon their arrest if the charges were subsequently dismissed or they were found not guilty of the charges, former R.C. 109.60, Am.S.B. No. 170, 137 Ohio Laws, Part I, 447.

R.C. 2953.52(B)(2)(d). We have described R.C. 2953.52 as an exception to the general rule of openness in the public-records context. *State ex rel. Cincinnati Enquirer v. Winkler*, 101 Ohio St.3d 382, 2004-Ohio-1581, 805 N.E.2d 1094, ¶ 10.

**Pepper Pike *Is Inapplicable Here***

{¶ 70} Two obstacles prevent *Pepper Pike* from authorizing nonstatutory expungement of domestic-violence civil-protection-order ("CPO") records. First, such a power would undermine the General Assembly, which has commanded government agencies to maintain records of CPO proceedings and which has already identified who may apply to seal the records of those proceedings: juveniles. Second, *Pepper Pike* adopted the statutory definition of "expungement" in Ohio's criminal expungement statutes, a definition that is unworkable in the context of CPOs.

{¶ 71} With R.C. 3113.31, the General Assembly established a civil proceeding by which a person can obtain a protection order in cases of domestic violence. The statute vests jurisdiction with the domestic-relations division (in common pleas courts with such a division) to grant an ex parte protection order upon a showing of "[i]mmediate and present danger of domestic violence to the family or household member," which includes situations in which the respondent has threatened the family or household member with bodily harm. R.C. 3113.31(A), (B), and (D)(1).

{¶ 72} Not only has the General Assembly created CPO proceedings, it has identified the agencies that must maintain records of such proceedings and the class of individuals who may apply to seal those records. R.C. 3113.31(F)(1) requires trial courts to issue a copy of "any protection order" to all law-enforcement agencies with jurisdiction to enforce the order, and R.C. 3113.31(F)(3) directs those law-enforcement agencies to "establish and maintain an index" for the protection orders. This "statewide enforcement,

22

communication, indexing, and authority" is one of the distinguishing features of a domestic-violence CPO. *Felton v. Felton*, 79 Ohio St.3d 34, 39, 679 N.E.2d 672 (1997). As for who may apply to seal CPO records, the General Assembly has expressly afforded such relief to juveniles. In 2010, the General Assembly amended R.C. 3113.31 and the juvenile-record-sealing provisions in R.C. 2151.358 to authorize, and in some instances require, the sealing of records pertaining to CPOs issued against juveniles. 2010 Am.Sub.H.B. No. 10; R.C. 2151.358(D)(1), (D)(2), and (D)(3)(a); R.C. 3113.31(E)(9).

{¶ 73} This level of legislative attention leaves little room for the equitable remedy recognized in *Pepper Pike*. The maxim "equity follows the law" advises against inventing such judicial remedies where doing so would extend the scope of existing legislative remedies. *Civ. Serv. Personnel Assn., Inc. v. Akron*, 48 Ohio St.2d 25, 27, 356 N.E.2d 300 (1976). Moreover, "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Natl. RR. Passenger Corp. v. Natl. Assn. of RR. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). What it means to "expunge" a CPO record and who may apply for such a remedy are issues best left to the General Assembly.

{¶ 74} Notably, this court has also recognized the need to preserve CPO records in our rules of superintendence. Sup.R. 26.03(G)(4) establishes specific timetables for the juvenile and domestic-relations divisions to retain case files of petitions for domestic-violence protection orders, and Sup.R. 26.03(D) requires each division to "permanently" retain the index, docket, and journal.

{¶ 75} Aside from the fact that the CPO statutes do not allow for the equitable expungement power recognized in *Pepper Pike*, the definition of "expungement" relied on in *Pepper Pike* is unworkable in the CPO context. In *Pepper Pike*, we followed the expungement provisions in "Ohio's criminal expungement statute," R.C. 2953.32(C) and (F), for the purpose of ensuring

"clarity and uniformity" with the existing legislative scheme. *Pepper Pike*, 66 Ohio St.2d at 377-378, 421 N.E.2d 1303. That statute requires a trial court to order "all official records" of the case sealed and "all index references" pertaining to the case deleted, except as provided in subsection (F). R.C. 2953.32(C)(2). "Official records" means "all records that are possessed by any public office or agency that relate to a criminal case." R.C. 2953.31(D) and 2953.51(D). The majority does not explain how a court can "expunge" CPO records within the meaning of *Pepper Pike* when in *Pepper Pike* we adopted a statutory definition applicable only in the context of criminal records. Instead, the majority leaves it to the lower courts to determine what is meant by the term "expungement" in the CPO context.

{¶ 76} Admittedly, the rationale in *Pepper Pike* was imprecise, namely, our statement that "[t]he basis for such expungement * * * is the constitutional right to privacy." *Id*. at 377. But that statement does not stand for the proposition that expungement is an individual right or a judicial power guaranteed by the constitution. Although we stated that the right to privacy was the basis for exercising the expungement power in that case, we never said that it was the source of that power. In the very next sentence, we said, "[W]e follow other jurisdictions which recognize the power to grant this judicial remedy." *Id*. at 377. Those jurisdictions that identified the source of a court's expungement authority relied on the concept of "inherent equitable powers." *Webster*, 606 F.2d at 1230 (cited in *Pepper Pike* at 376, fn. 3). Notably, the validity of the federal authority relied on in *Pepper Pike* has come into question based on the United States Supreme Court's decision in *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), which identified the limits of a federal district court's inherent or ancillary authority. *See United States v. Lucido*, 612 F.3d 871 (6th Cir.2010) (in which the Sixth Circuit followed the First, Third, Eighth, and Ninth Circuits and abandoned the concept of an inherent

expungement power). But whatever remains of its federal underpinnings, *Pepper Pike* did not construct a bottomless reservoir of judicial expungement power, just as it did not recognize a constitutional right to expungement. Indeed, our subsequent holdings have consistently refused to adopt this latter proposition. *See State v. Hamilton*, 75 Ohio St.3d 636, 639, 665 N.E.2d 669 (1996) ("Neither the United States Constitution nor the Ohio Constitution endows one convicted of a crime with a substantive right to have the record of a conviction expunged"); *State v. Futrall*, 123 Ohio St.3d 498, 2009-Ohio-5590, 918 N.E.2d 497, ¶ 6 ("expungement is a privilege and not a right").

{¶ 77} This is not to say that a common pleas court is powerless over its own records. We have long recognized that a court has "supervisory power and control over its docket," *State ex rel. Buck v. McCabe*, 140 Ohio St. 535, 537, 45 N.E.2d 763 (1942), and "general custody of and authority over its own records and files," *Ex parte Thayer*, 114 Ohio St. 194, 150 N.E. 735 (1926), paragraph one of the syllabus. *See also Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) ("Every court has supervisory power over its own records and files * * *"). But appellant requests *expungement*, a legislatively defined remedy that encroaches on other branches of government and conceals historical fact from public view. Because the legislature has not afforded him such a remedy, the trial court was powerless to do so.

{¶ 78} If the majority is correct—if "unusual and extraordinary circumstances" can create an undefined, judicial expungement power—then what is so unusual or extraordinary about this case? While appellant's ex-wife eventually agreed to dissolve the CPO at some point during or after the divorce proceedings, there is no evidence that she used the CPO as a "vindictive tool to harass," as did the complainant in *Pepper Pike*. *Id.*, 66 Ohio St.2d at 377, 421 N.E.2d 1303. In fact, she never retracted the allegations of domestic violence underlying the CPO petition, and her agreement with appellant's expungement

SUPREME COURT OF OHIO

request was based on her concern for the best interests of her family. Equating every dissolved CPO with the "unusual and exceptional" circumstances discussed in *Pepper Pike* will undoubtedly invite litigation and confusion over two questions: (1) what other types of records can be expunged and (2) what does expungement mean in those contexts?

{¶ 79} *Pepper Pike* is distinguishable from this case in every way that matters. I would affirm the judgment of the court of appeals and hold that the expungement remedy recognized in *Pepper Pike* does not apply to domestic-violence CPO proceedings conducted in accordance with R.C. 3113.31. Therefore, I respectfully dissent.

O'CONNOR, C.J., and LANZINGER, J., concur in the foregoing opinion.

_____

Jerry H. Shade, for appellant.

_____